# STATE v. HOWARD LANSING HINES.

133 N. W. (2d) 371.

December 31, 1964—No. 39,301.

*John E. Simonett,* for appellant.

*Walter F. Mondale,* Attorney General, *J. Earl Cudd,* Solicitor General, and *Joseph P. Summers,* Special Assistant Attorney General, for respondent.

Rogosheske, Justice.

Defendant was convicted of robbery in the first degree committed on December 28, 1962, two miles north of Royalton, Minnesota. He appeals from the judgment.

The information charged that at the time and place stated, defendant, "aided by an accomplice actually present, to-wit: Ralph Hines," forcibly stole a station wagon automobile from the possession of Ira M. Burhans. Represented by appointed counsel,[1] defendant had a preliminary hearing, and after arraignment before the district court waived a jury. After trial to the court, he was found guilty as charged.

This appeal presents questions of the sufficiency of the evidence and of errors claimed in the admission of certain evidence and in the court's denial of defendant's repeated requests to call Ralph Hines, the alleged accomplice and defendant's brother, who was awaiting sentence after a plea of guilty to a charge of second-degree robbery arising out of the same occurrence. The issues raised make it necessary to detail the evidence tending to support the court's decision.

On December 28, 1962, the automobile which defendant and his brother were driving ran out of gas and became stalled upon the crossover connecting the double lanes of four-lane Highway No. 10, two miles north of Royalton. As Mr. Burhans, driving his employer's red

---

[1]Defendant, being indigent, also prosecutes this appeal with the assistance of counsel appointed by this court.

station wagon, approached from the north, he was waved to a stop. He stopped the station wagon about 150 feet south of the stalled vehicle, rolled down the front window, and asked what the trouble was. Although defendant denies it, Burhans testified that defendant, a stranger to him, was the first to come over to his car, saying that "they were out of gas and would like a push into town." Burhans also said that defendant "smelled as if he had been drinking" and that he appeared to have been injured "around the nose and mouth," with an appearance of recent bleeding in that area. Because of these circumstances, Burhans declined the request, explaining that he didn't think it "a good idea to push any one on a heavily traveled road." As he was preparing to leave, Ralph came over when defendant "hollered at" him and, in defendant's presence, grabbed Burhans by the shirt and said, "This is a hold up. Don't try anything funny and you won't get hurt." While this was happening, Burhans noticed a highway patrol car approaching from the south and called attention to it. He then related:

"* * * Ralph Hines looked over there and opened the car door and told me to get out and when I delayed getting out he pulled me out and got into the car himself. * * * As the police car pulled up Ralph Hines was pulling away from my car and I reached in and turned off the ignition, reached in to turn off the ignition but wasn't able to reach the ignition because Howard Hines behind me pulled me away and attempted to jump into the car.

* * * * *

"* * * Ralph Hines was driving the car and as the car was pulling away Howard Hines ran and jumped in but was unable to close the door, and * * * I ran up alongside of the car and pulled the door further open and grabbed Howard Hines * * * and pulled him out of the car."

Immediately before Ralph drove off, going south, the highway officer, who had turned into the crossover from his northbound direction, was bringing the patrol car to a stop some distance behind the station wagon. As that car began to move away, the officer observed one man in the car, one trying to get in on the driver's side, and the

third running alongside, pulling the second man from the car. When he walked up to the two men after the car had left, he heard defendant declare to Burhans that he was a hitchhiker unacquainted with the "other fellow" and he "didn't know what got into the other fellow." Mr. Burhans then told the officer that his car was being stolen and that defendant had aided the thief. After listening to both men (defendant again professing his surprise and innocence), the officer ran to the patrol car and radioed for help. While he was so engaged, defendant fled, running across the road ditch, over railroad tracks, and into a field toward a barn, refusing to halt when twice commanded to do so by the officer. The officer pursued and finally caught him when defendant was unable to negotiate a fence. Following this, the three men got into the patrol car. While the officer was radioing further information about the stolen vehicle and requesting roadblocks, Mr. Burhans noticed the station wagon returning, approaching from the south. The patrol car crossed over to the other lane and gave chase, pursuing it at high speed with flashing lights and siren. The Burhans vehicle traveled north about a mile toward Little Falls, then, turning into a crossover, proceeded south past the stalled vehicle and was overtaken and forced to stop about a mile south of Royalton. Ralph was apprehended, handcuffed, and put into the patrol car, after which defendant asked Ralph "what he was trying to do and Ralph shook his head," refusing to answer questions. The officer ascertained from identifications furnished by them that Ralph and the defendant were brothers. When help arrived minutes afterward, they were separately taken to the county jail.

The foregoing summary of the testimony of Mr. Burhans and the officer completed the state's case in chief. Defendant thereupon testified in his own defense. He insisted that Ralph, not he, first went over to the station wagon to "get a ride into town or a push or something." Defendant had been bleeding and claimed he desired medical attention. He testified that when Ralph and Mr. Burhans were out of the car, Ralph waved to him to come over. As he approached, they were talking but he did not hear what was said. Then—

"When I got up to the car Ralph got into the car and Mr. Bur-

hans stood with his back to the door holding the door open and I proceeded to get in, and somehow just about the time I was going to start to get in, that is when he said something to me. I don't know his exact words, but I know he did grab me by the shirt sleeves and I was not quite all the way in the car because I couldn't get the door shut because I was in the car and the car started to move and pulled the door shut and I was hanging onto the wheel."

He further testified that he did not expect the car to move. He denied that he tried to close the door or use force to escape from Mr. Burhans' grasp, explaining that when he had hold of the steering wheel and Mr. Burhans was trying to pull him from the car, he pushed back because he was "afraid of falling and getting hurt." He said, "I was expecting that I would sit in the middle and my brother would be on the passenger side and Mr. Burhans would give us a ride into St. Cloud." He denied any intention or knowledge of taking the station wagon and that he had any conversation with Mr. Burhans before being pulled from the car. Although he admitted fleeing, he insisted it was because of fear of being blamed for what Ralph had done after Mr. Burhans had accused him of assisting in the theft. He did not deny that he made statements to Mr. Burhans and the officer to the effect that he was a hitchhiker and unacquainted with Ralph.

On cross-examination, over objection, he admitted that the stalled vehicle belonged to a Mr. Quiggle. Although admitting that he had been injured, he refused to answer any questions concerning how and where he received the injuries, where he and his brother had come from, or how they obtained Mr. Quiggle's car, upon the ground that the answers would incriminate him. For the same reason he also refused to answer any questions concerning previous felony convictions.

The state then called Walter Quiggle, an employee of the State Reformatory. Over a continuing objection that this testimony was immaterial, irrelevant, and improper rebuttal, Mr. Quiggle testified that earlier in the day of the robbery he saw defendant and Ralph at the scene of an accident on Highway No. 10 about a mile south of St. Cloud. He learned that a vehicle in which they were traveling had struck the rear of a vehicle driven by a Mr. Olson who, like Quiggle,

was also employed at the reformatory. Knowing Olson, he went to his aid. Shortly thereafter Ralph came up from where their vehicle had come to rest in a ditch some distance away and asked for assistance to get defendant to a doctor. Defendant also came up and at the time was bleeding "quite extensively from the nose." Defendant, Olson, and Quiggle knew each other. Quiggle told them to wait in their car but the brothers went to sit in Quiggle's car. After Mr. Quiggle satisfied himself that an ambulance was coming for Mr. Olson, he agreed to take defendant to a doctor to obtain medical attention. With defendant sitting in the middle and Ralph on the right in the front seat, Quiggle drove into St. Cloud and toward the St. Cloud Hospital. As they were on the road to the hospital, Ralph reached behind defendant and grabbed Quiggle around the neck. Quiggle slowed his car almost to a stop, broke loose, opened the door, and got out. Defendant slid into the driver's seat and drove the car away, heading north toward the hospital.

Defendant resumed the stand in rebuttal. He did not contradict Quiggle's testimony in any particular. His testimony was confined to describing the clothing he and his brother were wearing at the scene of the stalled vehicle in an attempt to establish that Burhans' description of the clothing of the person who first approached him fitted Ralph's.

Following denial of defendant's motion for dismissal and a final argument by defendant's counsel, the court adjudged defendant guilty as charged. Thereupon the state filed an information alleging three previous felony convictions, to each of which defendant pleaded not guilty. After a few days' delay, he was tried by a jury as to one of the convictions and found guilty. Subsequently he changed his plea from not guilty to guilty as to the two remaining convictions alleged in the information. He was then sentenced to a term of not to exceed 15 years.

1. From the foregoing recital, it is apparent that the testimony was in sharp conflict, the sufficiency of the state's proof of defendant's criminal intent being crucial. Obviously, the court disbelieved defendant's professed surprise over his brother's actions and concluded that the circumstantial evidence was wholly consistent with guilt and estab-

lished an intent to aid Ralph in stealing the vehicle. We believe the evidence ample to sustain that conclusion.

Defendant contends that the court could have based its conclusion on evidence erroneously admitted, resulting in prejudice to defendant's right to a fair trial. Having never denied his presence at the scene of the robbery, he argues that it was vital to the state's case to prove that the defendant knew Ralph was committing a robbery and that he intended to participate. Such proof, he claims, was supplied by permitting Mr. Burhans, over objection, to give his "impression" of what defendant knew.

On cross-examination, when Mr. Burhans was asked if he knew whether defendant heard Ralph say to him, "This is a stick up," he replied, "I can't speak for somebody else. I don't know whether he heard it or not." On redirect, he was asked:

"Q   In the conversation you had with Howard after Ralph left with the car did you get the impression that he saw and heard everything that went on or not?

"MR PHILLIPS.   That is objected to as calling for a conclusion of the witness.

"MR FELIX.   It isn't a conclusion.

"THE COURT.   He asked him for an impression. You are asking him for an impression?

"MR FELIX.   The impression that he obtained from the actions of Howard and his conversation with both, the impression he obtained as to whether he got the impression that Howard knew accurately and exactly what was happening.

"THE COURT.   He may answer.

"A   My impression was that he did understand or knew what was going on.

"MR FELIX.   He was right behind Ralph at the time?

"A   At the time that Ralph reached into the window he was right there.

"Q   You had no trouble hearing him say 'This is a hold up'?

"A   No. He was right next to him."

Although the strict analytical approach concerning the admissibility

of opinion evidence no longer prevails,[2] it is well established that a witness is not permitted to give a conclusionary opinion or impression upon such a crucial issue as the subjective intention or knowledge of an accused in a case such as this because the witness "could not know of his own knowledge what another *knew*."[3]

Recognizing that our present approach, espoused by McCormick,[4] accords to the trial judge a wide range of discretion in admitting opinion evidence,[5] we must agree that the answer given was pure conjecture. Had the witness made a responsive answer to the pending question rather than to counsel's explanation to the court of what he sought to elicit thereby, such an answer could have justifiably been classified as a statement of his recollection of observed facts in terms of an inference and, thus, admissible.[6]

2. Even though the court should not have permitted an answer after the form of the question was modified, the answer given was superfluous in the sense that it was very unlikely to be deemed of value by an experienced trial judge and even more unlikely to be deemed acceptable as proof resolving the crucial issue. Mr. Burhans, both on direct and cross-examination, was required to describe in detail where the defendant and Ralph were when the latter made his threatening statement. This testimony, undoubtedly accepted by the court, clearly provided a sufficient basis to draw the reasonable inference that the defendant did in fact understand and know what was happening. Absent a clear showing that some right of defendant was invaded, we are not persuaded that the receipt of this evidence would warrant a new trial.

3. Defendant also contends that errors occurred during presentation of evidence concerning the taking of Quiggle's car. First, he argues that the prosecutor's repeated questioning of defendant about the affair

---

[2]E. g., compare Lovejoy v. Howe, 55 Minn. 353, 57 N. W. 57, with Greenberg v. Holfeltz, 244 Minn. 175, 69 N. W. (2d) 369.

[3]Bank of Commerce v. Selden, Withers & Co. 1 Minn. 251 at 256 (340 at 345).

[4]McCormick, Evidence, § 11.

[5]Lewin v. Proehl, 211 Minn. 256, 300 N. W. 814.

[6]Lewin v. Proehl, *supra.*

was itself a violation of defendant's constitutional privilege against self-incrimination.

Questions intended to force admissions relating to collateral criminal conduct may violate the privilege against self-incrimination but, more comprehensively, are usually irrelevant and prejudicial.[7] We do not agree, however, that the Quiggle incident must be regarded as collateral or unrelated to the crime charged. Rather, we believe that the evidence of the Quiggle robbery is relevant to the issues tried, namely, guilty knowledge and criminal intent.[8] Defendant, by taking the stand, waived his privilege concerning all questions bearing on the crime charged, and he also thereby surrendered his privilege of not testifying about other crimes relevant to those elements. Thus, the trial court quite properly could have disallowed the claim of privilege asserted when defendant was questioned about the Quiggle incident. It follows that repeated questioning could not result in prejudice.

4-5. Defendant's other two points concern the admission of Quiggle's testimony. The first of the two is the contention that his testimony was improperly received in rebuttal. Under the court's power to regulate the order of proof,[9] it was within the court's discretion to receive it at this stage of the trial.[10] Since defendant maintained that he was only seeking help to obtain medical attention and categorically denied any knowledge of his brother's intention to take Burhans' car and any intent to aid him, the testimony concerning Quiggle's efforts to take defendant to the St. Cloud Hospital, his knowing participation in stealing the Quiggle vehicle, and his undoubted driving past the hospital, tended directly to refute defendant's testimony. It cannot be said, as in Mathews v. Chicago & N. W. Ry. Co. 162 Minn. 313, 318, 202 N. W. 896, 899, relied upon by defendant, that this amounted to "a reopening of the main case under the guise of rebuttal."

---

[7]State v. Gress, 250 Minn. 337, 84 N. W. (2d) 616; State v. Silvers, 230 Minn. 12, 40 N. W. (2d) 630.

[8]State v. Jansen, 207 Minn. 250, 290 N. W. 557.

[9]State v. Elli, 267 Minn. 185, 189, 125 N. W. (2d) 738, 741.

[10]State v. Cantieny, 34 Minn. 1, 24 N. W. 458.

Defendant's final contention is that Quiggle's testimony was inadmissible because it was irrelevant to any issue being tried. As in his argument concerning questions directed to himself on the subject, he takes the position that the Quiggle incident was a collateral crime irrelevant to the substantive issues and that evidence relating to it was inadmissible merely to attack his credibility. Since this testimony was presented by Quiggle, not defendant, the privilege against self-incrimination, being personal, has no application. The question of admissibility, therefore, depends solely on relevance.

We adhere to the prevailing rule that an accused does not by testifying put in issue his general character or propensities; and although his credibility may otherwise be assailed, it cannot be done by introduction of evidence of collateral crimes. Involvement in disconnected criminal conduct thus is regarded as inadmissible as a matter of policy because it creates a probability of guilt irrespective of guilt of the crime charged.[11] Where, however, the evidence of other criminal conduct is relevant to an issue being tried and is not merely to show a general disposition to criminal or meretricious conduct, it is admissible. As stated in State v. Wofford, 262 Minn. 112, 118, 114 N. W. (2d) 267, 271:

"It is well recognized that the rule excluding evidence of the commission of other offenses does not necessarily deprive the state of the right to make out its whole case against the accused on any evidence which is otherwise relevant upon the issue of the defendant's guilt of the crime with which he was charged. The state may prove all relevant facts and circumstances which tend to establish any of the elements of the offense with which the accused is charged, even though such facts and circumstances may prove or tend to prove that the defendant committed other crimes."[12]

As we said in relation to questions asked the defendant, the Quiggle incident was relevant to the issues of guilty knowledge and intent—

---

[11]State v. Haney, 219 Minn. 518, 18 N. W. (2d) 315; State v. Friend, 151 Minn. 138, 186 N. W. 241.

[12]See, also, State v. Connelly, 249 Minn. 429, 82 N. W. (2d) 489;

not merely to credibility. Evidence concerning it was therefore admissible.

6-7. Sometime prior to defendant's trial, his brother, Ralph, had pleaded guilty to taking the station wagon by robbery and during the trial was being held in the county jail awaiting sentence. Since the state did not choose to call him, defendant repeatedly requested the court to do so subject to cross-examination by both sides. The court, aware of Ralph's status, refused, responding to each request with an offer to have Ralph brought before the court and made available to be called by defendant. Defendant declined the offer, explaining that if he called Ralph as a witness it would amount to an admission that "I am guilty when I am not guilty," and that if Ralph testified favorably for the defense, he might provoke a "stiffer" sentence against himself.

Defendant strongly urges that under the circumstances—Ralph's testimony being essential to a complete disclosure of all available facts— we should hold that it was the court's duty to honor his request and, further, that the refusal deprived him of his constitutional right "to be confronted with the witnesses against him."[13]

As defendant points out, there is authority for the proposition that the trial judge has discretionary power not only to examine but to call witnesses. In McCormick, Evidence, § 8, it is asserted:

"Under the Anglo-American trial system, the parties and their counsel have the primary responsibility for finding, selecting and presenting the evidence. * * * Nevertheless, our system of party-presentation is not exclusive or all-sufficient. It is but a means to the end of disclosing truth and administering justice, and for reaching this end the judge has the over-all responsibility. When the party-presentation is incomplete and fails to elicit some material fact the judge not only may, but seemingly owes a duty to supply the omission by further examination.

\* \* \* \* \*

"Not only may the judge examine witnesses called by the parties,

State v. Voss, 192 Minn. 127, 255 N. W. 843; Note, 37 Minn. L. Rev. 608; Annotation, 42 A. L. R. (2d) 854.

[13]Minn. Const. art. 1, § 6.

he may also, for the same purpose of bringing out material facts that might not otherwise be elicited, call witnesses himself whom the parties might not have chosen to call. * * * He may then invoke the court's discretion to call the witness, in which event either party may cross-examine and impeach him."

In State v. Axilrod, 248 Minn. 204, 208, 79 N. W. (2d) 677, 681, we said:

"* * * It is generally held that a trial court has no affirmative duty to call a witness on its own initiative."[14]

Conceivably, situations may arise where the party-presentation is so incomplete that a court's refusal to call a witness could be found to be an abuse of discretion.[15] We have never been confronted with such a case. Defendant insists that this case presents such a situation, but we do not agree. The testimony presented covered all facts necessary or essential to a determination of the disputed issues. With the possible exception of an explanation of why Ralph returned to the scene, calling him would only have added another version of the events described by the other witnesses. We fail to see how an explanation of his reappearance was essential to resolving any issue in the case. Nothing prevented defendant from calling his brother except his speculation that it might prove detrimental to both of them. Had he been called by defendant and testified adversely, it is reasonably likely that he would have been regarded as a hostile witness, especially since sentencing had presumably been withheld. Defendant thereupon would have been entitled to cross-examine.[16]

The right of confrontation guaranteed by the constitution requires only that a witness against the accused must appear and testify in the latter's presence in open court and submit to cross-examination.[17]

---

[14] 9 Wigmore, Evidence (3 ed.) § 2484.

[15] See the dissenting opinion of Mr. Justice Frankfurter in Johnson v. United States, 333 U. S. 46, 54, 68 S. Ct. 391, 395, 92 L. ed. 468, 474; Note, 58 Yale L. J. 183.

[16] State v. Axilrod, 248 Minn. 204, 79 N. W. (2d) 677.

[17] 1 Cooley, Constitutional Limitations (8 ed.) pp. 662 to 667.

This provision has no application to a witness who does not appear. We find no error which would warrant disturbing the judgment.

Affirmed.