**SECURITY STATE BANK OF HOWARD LAKE,**
Respondent,

v.

**Jerome DIELTZ, et al., Defendants,**

**Palmer Koosmann, et al., Appellants.**

No. C7–87–102.

Court of Appeals of Minnesota.

June 23, 1987.

Denis E. Grande, Arthur, Chapman, Michaelson & McDonough, P.A., Minneapolis,

Charles E. Paschke, Howard Lake, for respondent.

Darel F. Swenson, Wayzata, for defendants.

HEARD, considered and decided by SEDGWICK, P.J., and PARKER and NIERENGARTEN, JJ.

## OPINION

SEDGWICK, Judge.

Respondent Security State Bank of Howard Lake ("Security State" or "the Bank") sued appellant Palmer Koosman, Jerome Dieltz and The New Howard Lake Motors, Inc. ("NHLM") to recover losses resulting from the dishonor of a check deposited in NHLM's checking account. A jury found that Koosman had defrauded Security State and awarded it compensatory damages. Koosman appeals from the judgment and order denying him a new trial or judgment notwithstanding the verdict. We affirm.

## FACTS

Koosman worked as a bookkeeper at NHLM, an auto dealership, from June 1, 1984, until it went out of business around June 1, 1985. He had been hired by Jerome Dieltz, who was president and 50% owner of NHLM. Three other persons worked at NHLM: two salesmen and a secretary, Frances Habisch. Koosman's responsibilities included preparing and reconciling NHLM's ledgers and financial statements; logging car sales on the computer; reconciling bank statements; collecting accounts; occasionally helping with the management when requested to by Dieltz; and reconciling monthly statements issued by Chrysler Credit Corporation ("CCC").

CCC financed NHLM's inventory under a "floor-planning" method: NHLM would order a car from CCC, and CCC would pay the factory, which would deliver the car to NHLM. CCC retained title. When NHLM sold the car, it was obligated to pay CCC immediately for the cost of the car. CCC would then send NHLM the title documents, and NHLM was supposed to transfer title to the customer.

CCC also provided NHLM with "direct" inventory financing: NHLM would buy a car from another dealer and present proof of ownership to CCC, which would take title to the car and loan NHLM money in return.

Almost the entire year Koosman worked at NHLM it was "out-of-trust" with CCC, which meant NHLM was not paying CCC when it sold financed cars. CCC would discover this during its periodic checks of NHLM's inventory, and NHLM would then pay for the cars it had sold. When NHLM was out-of-trust, customers would not receive title to their cars. CCC eventually gave titles to approximately 30–35 NHLM customers who complained that they had not received them.

In February, 1985, Koosman and Dieltz signed an agreement to operate a car dealership called "Auto City," which was owned by Koosman. Auto City and NHLM bought and sold cars from each other between March and May, 1985, before Auto City was licensed to sell cars. Dieltz testified the sole purpose of the transactions was to raise money for NHLM when it needed cash: Auto City would pay NHLM and receive title in return, but the cars never moved. Koosman denied these were sham sales that were really loans to NHLM. After NHLM closed, Auto City obtained an auto dealer's license and leased lot space, but the partnership soon ended because the State told Koosman he would lose his license if Dieltz remained at Auto City.

NHLM had a general checking account and a payroll checking account at Security State. Both Koosman and Dieltz had check-signing authority on those accounts. Auto City had three checking accounts at the State Bank of Rogers: a general account; an account entitled "Auto City-Expense Account-Koosman;" and one entitled "Auto City-Expense Account-Dieltz." Only Koosman had check-signing authority on the general account and his expense account, and only Dieltz had check-signing authority over his expense account.

The series of transactions leading to this lawsuit began on May 30, 1985. That day, Koosman delivered to CCC title documents showing NHLM as owner of two cars, along with security agreements and promissory notes signed by Dieltz. CCC gave Koosman a check for $23,470.05 payable to NHLM ("the CCC check") as financing for the cars. Unknown to CCC, NHLM did not own the cars because it had previously sold them.

Habisch deposited the CCC check, endorsed by NHLM's rubber stamp, in NHLM's general account the same day. At Koosman's instructions, she also bought a money order for $7000 with a NHLM check payable to Security State and signed by Koosman. The $7000 money order was made payable to Auto City.

On May 31, 1985, Koosman deposited the $7000 money order in the Auto City general account at the State Bank of Rogers. Koosman testified that NHLM owed Auto City $7000 because NHLM had sold a car owned by Auto City. Koosman had NHLM pay Auto City by money order rather than by check, he testified, because he was concerned the NHLM check would bounce.

Koosman testified that on the morning of May 31 he told Dieltz the NHLM general account was overdrawn. In the past, Dieltz had deposited his own money in NHLM's account to cover overdrafts. This time Dieltz told Koosman he was not going to cover the checks. He asked Koosman to try to stop payment on two checks that had been sent to CCC, so that NHLM's local checks could be paid.

Later that day, Koosman met with two bank officers, Gary Vangen and Steven Halverson. Koosman told them NHLM did not have enough funds in its account to cover its outstanding checks and asked them to stop payment on the checks sent to CCC. They refused. Koosman asked if the Bank could pay the local checks first, but they said they must pay checks in the order received.

All three eventually agreed that the best way to handle the problem would be to close the account, so that NHLM could choose whom to pay first. The bank executives testified it was Koosman who brought up the idea of closing the account. Koosman denied this and testified it was Halverson who first suggested it.

Security State closed the NHLM account by giving Koosman a money order for $8,662.89, payable to NHLM (the "closing check"). Koosman also received a regular payroll check for $733.14, which he cashed the same day. When Koosman returned to NHLM he gave Dieltz the closing check.

The next business day, June 3, the closing check, endorsed by Dieltz, was deposited in his Auto City expense account. Koosman testified Dieltz made the deposit, but Dieltz denied this and testified the signature on the deposit slip was in Koosman's handwriting.

CCC's bank stopped payment on the CCC check on June 3. It had discovered that NHLM did not own the cars used to obtain the check when it inspected NHLM's inventory on May 31, 1985. Vangen conceded at trial that Security State could have protected itself against the losses resulting from the dishonor of the CCC check by not allowing NHLM to draw on the check or close its account until the check cleared, but he explained it was Bank policy to allow withdrawals on "uncollected balances."

Security State then brought this action, alleging that Koosman and Dieltz committed fraud by depositing the CCC check knowing it would be dishonored (since the financed cars had previously been sold) and closing the account. NHLM and Dieltz filed for bankruptcy prior to trial, so the Bank proceeded only against Koosman.

Koosman testified as follows: He did not know NHLM was obtaining financing on cars it had already sold. When he would attempt to reconcile the monthly CCC statement with the inventory, he would find cars listed as still being financed that were not on NHLM's lot, but Dieltz would tell him the cars were elsewhere. Koosman admitted, however, he knew NHLM was out of trust and that customers were complaining about delays in receiving title. Koosman further testified that on May 30,

1985, Dieltz gave him an envelope containing the title and loan documents and told him to take it to CCC and bring back a check, and that he did not look inside the envelope.

Dieltz testified that Koosman must have known that the cars used as collateral for the CCC check had previously been sold because he had to reconcile the CCC statement every month and NHLM's books would have shown that the cars had been sold. Dieltz further testified that he and Koosman talked about "this" and about how long they could keep "this" up. Dieltz first denied having put the financing documents used to obtain the CCC check in an envelope before giving them to Koosman, but then testified he did not remember if he did and that it is possible he may have done so.

The jury found by special verdict that Koosman had committed fraud against Security State and awarded it damages of $16,396.03 (the sum of the closing check, the check used to purchase the money order, and Koosman's last paycheck). Koosman moved twice for a new trial or judgment notwithstanding the verdict. He appeals from the judgment and orders denying him post-trial relief.

### ISSUES

1. Is the verdict that Koosman defrauded Security State · supported by the evidence?

2. Did the trial court err in denying Koosman's motion for a new trial based on its overruling certain of his evidentiary objections?

3. Did the trial court err in denying Koosman's motion for a new trial based on its denial of his motion to reopen his case?

### ANALYSIS

1. *Sufficiency of evidence.*

■ A trial court's denial of a motion for a new trial or judgment notwithstanding the verdict will not be reversed absent a clear abuse of discretion. *See Shastid v. Shue*, 247 Minn. 314, 329, 77 N.W.2d 273, 283 (1956). Where the verdict is challenged on the ground it is not supported by the evidence, this court considers the evidence in the light most favorable to the prevailing party, and the verdict will be affirmed if the evidence reasonably supports it. *Kuehl v. National Tea Co.*, 310 Minn. 48, 50, 245 N.W.2d 235, 237 (1976). The question is whether the jury could reasonably make the finding. *Id.*

■ Security State argues that Koosman committed fraud by concealing material facts. As a general rule one party to a transaction has no duty to disclose material facts to the other, but "special circumstances" may dictate otherwise. *Klein v. First Edina National Bank*, 293 Minn. 418, 421, 196 N.W.2d 619, 622 (1972). For example,

> if a party conceals a fact material to the transaction, and peculiarly within his own knowledge, knowing that the other party acts on the presumption that no such fact exists, it is as much a fraud as if the existence of such fact were expressly denied, or the reverse of it expressly stated.

*Richfield Bank & Trust Co. v. Sjogren*, 309 Minn. 362, 365, 244 N.W.2d 648, 650 (1976) (quoting *Thomas v. Murphy*, 87 Minn. 358, 361, 91 N.W. 1097, 1098 (1902)); *see also Klein*, 293 Minn. at 421, 196 N.W.2d at 622 ("One who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party.").

Security State cites eight "material facts" that Koosman allegedly concealed, such as Dieltz's decision not to put more money into NHLM and the "loans" from Auto City to NHLM. We agree with Koosman that none of those facts can be considered material to the transactions at issue.

Koosman concedes, however, that if he knew the CCC check had been fraudulently obtained, his nondisclosure of that fact would sustain the finding of fraud. This fact would be material because it would "naturally affect" the Bank's decisions to allow the withdrawals from NHLM's account. *See Nave v. Dovolos*, 395 N.W.2d

393, 398 (Minn.Ct.App.1986). A jury could also find that Koosman would have a duty to disclose it because the Bank would not have access to this information. *See Richfield*, 309 Minn. at 369, 244 N.W.2d at 652 ("special circumstances" requiring disclosure found to exist where party knew of another's fraudulent activities).

■ We conclude that the jury could have reasonably found that Koosman knew the CCC check had been fraudulently obtained. Koosman was in charge of keeping track of NHLM's financial and inventory records, and specifically had the duty of reconciling the CCC statement. He knew NHLM was retaining title to cars it sold. He delivered the financing documents used to obtain the CCC check. Dieltz testified that Koosman must have known the two cars used as collateral had previously been sold, because he had to reconcile the CCC account, and that they spoke about how long they could continue double-financing cars. Based on this evidence, the jury would be justified in disbelieving Koosman's testimony and finding that he knew the cars financed by the CCC check had previously been sold.

### 2. *Admissibility of evidence.*

■ Koosman argues he is entitled to a new trial because the trial court erroneously admitted two items of testimony over his objections. Evidentiary rulings are ordinarily within the sound discretion of the trial court. *McGuire v. C & L Restaurant Inc.*, 346 N.W.2d 605, 615 (Minn.1984). The admission of inadmissible evidence requires a new trial only if the error is prejudicial. *E.g.*, *Fewell v. Tappan*, 223 Minn. 483, 497, 27 N.W.2d 648, 656 (1947); *see also* Minn. R.Evid. 103.

A. Dieltz testified, over objection, that Koosman "knew" the cars used to obtain the CCC check had previously been sold. Koosman argues this was reversible error. He cites *State v. Hines*, 270 Minn. 30, 37, 133 N.W.2d 371, 376 (1964), in which it was held error to allow a witness to testify that a defendant charged with robbery "knew what was going on." The supreme court explained:

[I]t is well established that a witness is not permitted to give a conclusory opinion or impression upon such a crucial issue as the subjective intention or knowledge of an accused in a case such as this because the witness "could not know of his own knowledge what another *knew*."

*Id.* (emphasis in original) (quoting *Bank of Commerce v. Selden, Withers & Co.*, 1 Minn. 340, 345 (Gil. 251, 256) (1856)).

■ *Bank of Commerce* suggests if the witness testifies to the facts underlying his belief that the other person "knew," the error would likely not be prejudicial. 1 Minn. 340, 345 (Gil. at 256–57). Here, Dieltz explained why he believed Koosman knew about the double-financing, so the jury was able to decide for itself whether Dieltz's conclusion was well-founded. Since Dieltz testified that he and Koosman spoke about double-financing, his testimony that Koosman knew the cars had been sold was largely superfluous and does not warrant a new trial. *See Hines*, 270 Minn. at 37, 133 N.W.2d at 376 (refusing to order new trial because sufficient other evidence that defendant "knew").

■ B. Lionel Kinney, the CCC manager who was in charge of NHLM's account, testified that in his experience it would not be possible to conceal from the managers of an auto dealership the double sales of 30 or 35 cars. Koosman's attorney objected that the testimony was speculative. If it was error to admit the testimony, it was harmless in light of all the evidence.

In *Moeller v. St. Paul City Railway Co.*, 218 Minn. 353, 365, 16 N.W.2d 289, 296 (1944), a wrongful death action, the supreme court held that even if it was error to allow an expert to testify to the speed of the streetcar, it was not ground for a new trial since the jury could have found excessive speed based on other evidence. The same rationale applies here. Kinney's testimony was not significant in light of all the other evidence suggesting Koosman knew NHLM was double-financing cars.

Koosman also argues it was error for the court to ask Dieltz and Koosman if they

would be able to answer the questions objected to, because it reinforced in the jury's mind the reliability of their testimony. The trial court's questions were entirely proper.

### 3. *Motion to reopen.*

After both parties had rested, the trial court denied Koosman's motion to reopen his case. He wanted to call a witness to rebut Dieltz's testimony that he (Dieltz) used approximately $3000 from the closing check to purchase a car for Auto City.

▪ A decision to allow a party to reopen rests within the sound discretion of the trial court, and its decision will not be reversed absent a clear abuse of discretion. *Hamilton v. Killian,* 296 Minn. 256, 259–60, 207 N.W.2d 703, 705 (1973). There was no abuse of discretion here. The proffered testimony is relatively insignificant, and Koosman could have been prepared for Dieltz's testimony if he had deposed Dieltz before trial.

### DECISION

Affirmed.