STATE of Minnesota, Respondent,

v.

David G. LANAM, Appellant.

No. C8–89–95.

Supreme Court of Minnesota.

Aug. 10, 1990.

John Stuart, State Public Defender, Mark F. Anderson, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, Asst. Atty. Gen., St. Paul, and Harris Darling, Nobles County Atty., Worthington, for respondent.

KEITH, Justice.

Defendant, David G. Lanam, was found guilty by a district court jury of two counts of criminal sexual conduct in the first degree, Minn.Stat. § 609.342, subd. 1(a), (e)(i) (1988), for sexually abusing a 3–year–old girl while he was babysitting with her and her brothers. He received a 43–month prison sentence, which has been stayed pending appeal. The main issue is whether the trial court violated state law or the state or federal constitution in admitting out-of-court statements of the child, who was determined by the trial court to be incompetent to testify at trial, concerning the abuse. The court of appeals affirmed. *State v. Lanam*, 444 N.W.2d 882 (Minn. App.1989). We also affirm.

The abuse occurred during the fall of 1987 but did not come to light until later, after the child, S, was removed from her mother's care and placed in foster care with a woman who had been providing daycare, Sharon Carlson. In response to a report that the child might have been sexually abused, Carlson read her the book *Private Zones*, a book aimed at teaching children the difference between "good touch" and "bad touch." The following Monday, May 2, 1988, Carlson overheard S telling Carlson's own child that someone had touched her private zone. When Carlson questioned her, S said "David" had done it. She then related the details of what happened, saying he had touched her "in the hole" and had "peed" in her mouth and she had "spitted it out." S said that when she had cried because it hurt, he had slapped and spanked her and told her not to tell anyone. S said that "David" did it while babysitting at her mother's house.

A police officer and a social worker met with her and, using anatomically correct dolls, S showed them what happened. A medical examination on May 3 confirmed that S had been sexually abused. The doctor noted scarring on S's hymen and an enlarged vaginal opening. She ruled out any disease or other condition as possible causes.

The only "David" whom Carlson knew was defendant, David Lanam, who on several occasions had picked up S and her siblings from Carlson's house when the children were there for daycare. When Carlson asked some questions to identify who "David" was, S described him as the "David" who worked for "Pizza Hut," a generic term S used for all pizza places.

She said he lived near her house and often sat with her at her mother's house. S subsequently pointed out defendant's house one day as they drove by it. She also identified defendant one day as the "David" when she saw him accidentally in the hall at the courthouse on the day of a hearing.

The key issue at defendant's trial was the issue of identity, with the defense claiming that S might have been referring to another "David" who had sat with her, David Richardson. Richardson testified, however, that he had babysat with the children only before mid–September—i.e., apparently before the abuse occurred—and that he had sat with the children only at his house in the presence of his sister and mother. Moreover, he neither worked for a pizza place nor lived near S's mother's house. S was declared incompetent to testify but her statements were admitted substantively under Minn.Stat. § 595.02, subd. 3 (1988). Other evidence was admitted showing that defendant, and not David Richardson, fit the description provided by S: (a) evidence that defendant worked at Domino's Pizza and that the child called all pizza places "Pizza Hut," (b) evidence that defendant lived near S's mother's house, (c) evidence that only defendant, and not David Richardson, sat with her at her mother's house, and (d) evidence concerning S's seeing and identifying defendant in the halls of the courthouse.

1. The main issue which we address is whether the admission of S's out-of-court statements violated defendant's right of confrontation, guaranteed by both the Minnesota constitution and the federal constitution. Defendant contends that S's incompetence to testify is not equivalent to unavailability and that therefore her statements should not have been admitted against him without giving him a chance to cross-examine her. He also argues that even if she was unavailable, her statements were unreliable and should not have been admitted.

S's statements were admitted pursuant to Minn.Stat. § 595.02, subd. 3 (1988), which provides:

An out-of-court statement made by a child under the age of ten years * * * alleging, explaining, denying, or describing any act of sexual contact or penetration performed with or on the child or any act of physical abuse of the child * * * not otherwise admissible by statute or rule of evidence, is admissible as substantive evidence if:

(a) the court or person authorized to receive evidence finds, in a hearing conducted outside of the presence of the jury, that the time, content, and circumstances of the statement and the reliability of the person to whom the statement is made provide sufficient indicia of reliability; and

(b) the child * * * either:

(i) testifies at the proceedings; or

(ii) is unavailable as a witness and there is corroborative evidence of the act; and

(c) the proponent of the statement notifies the adverse party of the proponent's intention to offer the statement and the particulars of the statement sufficiently in advance of the proceeding at which the proponent intends to offer the statement into evidence to provide the adverse party with a fair opportunity to prepare to meet the statement.

For purposes of this subdivision, an out-of-court statement includes video, audio, or other recorded statements. An unavailable witness includes an incompetent witness.

■ Although we have the primary responsibility under the separation of powers doctrine for the regulation of evidentiary matters, we have enforced reasonable statutory rules of evidence as a matter of comity if the rules are not in conflict with the Minnesota Rules of Evidence. *State v. Dana,* 422 N.W.2d 246, 249 (Minn.1988). Relevant cases of this court interpreting and applying the statute include: *State v. Conklin,* 444 N.W.2d 268 (Minn.1989); *State v. Dana,* 422 N.W.2d 246 (Minn. 1988); *State v. Burns,* 394 N.W.2d 495 (Minn.1986).

Most recently, in *State v. Larson,* 453 N.W.2d 42 (Minn.1990), we chose not to

decide whether to construe the statute as not requiring the state to call a child declarant who is available. Instead, we held that the statements in that case were admissible under Minn.R.Evid. 803(24) and 803(4) even though the nontestifying declarant was available. In so doing we noted that the United States Supreme Court in *United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), had made it clear that the unavailability of the declarant is not always prerequisite to admission of hearsay evidence against the defendant in every criminal case. *Larson*, 453 N.W.2d at 45–46. We also held that in future cases of that kind the state must, when expressly requested by the defendant to do so, call in its case-in-chief an available witness whose hearsay statements are being admitted against the defendant. *Id.* at 47.

In this case the defendant concedes that the statements were admissible under the statute but contends that S's incompetence as a witness is not the equivalent of unavailability for the purpose of confrontation clause analysis. He also contends that the statements were unreliable. We see no point in discussing whether a demonstration of unavailability was required in this case, as defendant argues. Suffice it to say, although unavailability is not always prerequisite to the admission of hearsay in a criminal case, it seems clear that the United States Supreme Court is willing to admit any kind of hearsay statement despite the confrontation clause if the declarant is unavailable and the statement is sufficiently reliable. *Idaho v. Wright*, — U.S. —, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 800[04] (1988) (interpreting *Ohio v. Roberts*, 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980)). A witness' testimony may be unavailable at trial for many reasons, including "incompetence, the * * * Rules of Evidence grounds for unavailability, the danger of severe psychological injury to a child victim from testifying, and an unwillingness or inability to testify." M. Graham, *The Confrontation Clause, the Hearsay Rule, and Child Sexual Abuse Prose-*

*cutions: The State of the Relationship*, 72 Minn.L.Rev. 523, 554 (1988). *See* Minn. Stat. § 595.02, subd. 1(*l*) (1988); Minn.R. Evid. 804(a).

A witness is not "unavailable" under *Roberts* unless the prosecutor has made a "good faith effort" to produce the witness. *Ohio v. Roberts*, 448 U.S. at 74–75, 100 S.Ct. at 2543. In this case the prosecutor clearly wanted to use S's testimony at trial and produced S at the required competency hearing. When the trial court ruled S incompetent, the prosecutor differed with the trial court as to the meaning of S's responses, apparently in an effort to persuade the court that she was competent. The defense, on the other hand, did not object to the determination that she was incompetent. Under these circumstances and based on the record and all the other facts, we conclude that S was unavailable for the purpose of confrontation clause analysis. In other words, to use the words of the United States Supreme Court in *Idaho v. Wright*, — U.S. —, —, 110 S.Ct. 3139, 3147, 111 L.Ed.2d 638 (1990), without deciding that the general requirement of unavailability applies, "to the extent the unavailability requirement applies in this case, [the child] was an unavailable witness within the meaning of the Confrontation Clause."

We also reject defendant's argument that S's out-of-court statements were unreliable. Specifically, defendant argues that S's incompetence to testify concerning the abuse indicates that her out-of-court statements concerning the abuse were of questionable reliability.

In determining competency of a child, the trial court must determine whether the child understands the nature and obligations of an oath and whether the child has "the capacity to remember or to relate truthfully facts respecting which the child is examined." Minn.Stat. § 595.02, subd. 1(*l*) (1988). The latter requirement does not mean that the court is to question the child on the details of possible testimony, but rather means that the court should determine in a general way whether the

child remembers or can relate events truthfully. The jury will judge the child's credibility and decide the weight to assign the testimony. A competency hearing is not a credibility hearing. Competency concerns the child's ability to be truthful and to understand the importance of telling the truth in court. It also concerns the child's ability to remember and relate events. Whether a child is easily led goes more to credibility than to competency. Even adults at trial become inconsistent upon cross-examination. It is the jury's province to sort out the inconsistencies and determine credibility, the court's province to determine competency. Where the court is in doubt as to the child's competency, it is best to err on the side of determining the child to be competent.

In concluding that S was incompetent, the trial court made certain statements which defendant argues cast doubt on the reliability of S's out-of-court statements describing the abuse. In support of this argument, defendant relies on *State v. Ryan*, 103 Wash.2d 165, 173, 691 P.2d 197, 203 (1984), but *Ryan* indicates that out-of-court statements by a child later determined to be incompetent to testify are unreliable only if the child was also incompetent at the time the statements were made. *Id.* Here, the trial court did not determine that S was incompetent at the time she made her statements about the abuse.

Whether or not a child's statement is sufficiently reliable under section 595.02, subd. 3(a), requires, in the words of the statute, an examination of the "time, content, and circumstances of the statement and the reliability of the person to whom the statement is made." *See State v. Dana*, 422 N.W.2d 246, 248–50 (Minn.1988) (holding hearsay statement of incompetent child admissible because it was reliable as determined by trial court looking at circumstances under which statement was made); *cf. State v. Daniels*, 380 N.W.2d 777, 783 (Minn.1986) (admitting excited utterances by young children despite their having been ruled incompetent to testify); *State v. Gorman*, 229 Minn. 524, 526–27, 40 N.W.2d 347, 348–49 (1949) (upholding admission of reliable excited utterance of child despite

child's having been ruled incompetent to testify); *Ball v. Gessner*, 185 Minn. 105, 108, 240 N.W. 100, 101 (1931) (upholding admission of hearsay as reliable although child incompetent to testify). More recently, in *State v. Conklin*, 444 N.W.2d 268, 276 (Minn.1989), we enumerated the factors that a trial court should consider in analyzing the reliability of out-of-court statements under the statute:

> [T]he court must consider, among other things, the spontaneity of the statements, the consistency of the statements, the knowledge of the declarants, the motives of the declarant and witnesses to speak truthfully and the proximity in time between the statement and the events described. \* \* \* The court also should consider possible suggestiveness created by leading questions, particularly by a parent or close authority figure; and should evaluate corroborating factors, such as whether the declarant has recanted or reaffirmed the statement and also any corroborating physical evidence.

Subsequent to our decision in *Conklin*, the United States Supreme Court in two recent cases has dealt with important confrontation clause issues in the context of prosecutions for child abuse. In *Maryland v. Craig*, —— U.S. ——, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), a prosecution of a defendant for sexually abusing a 6–year–old child, the Court upheld the use of a closed-circuit television procedure to facilitate the child's testimony after the trial court made a case-specific determination that the use of the procedure was necessary to protect the child from the emotional trauma of testifying in the defendant's presence. *Accord State v. Conklin*, 444 N.W.2d 268, 272–74 (Minn.1989). More directly relevant to this case is the Court's recent decision in *Idaho v. Wright*, —— U.S. ——, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). In *Wright*, the Court dealt with the issue of the admission pursuant to Idaho's residual exception to the hearsay rule of out-of-court statements by a 2½–year–old child sex abuse victim who was ruled incompetent to testify at trial because she was not capable of

communicating with the jury. The Court, as it has before, distinguished between extrajudicial statements admitted pursuant to a so-called firmly-rooted traditional exception to the hearsay rule (*e.g.*, statements admissible pursuant to the "medical treatment" exception) and statements admissible pursuant to a residual exception which "accommodates ad hoc instances." *Id.* at ——, 110 S.Ct. at 3147. Statements admitted under a firmly-rooted exception satisfy the confrontation clause's requirement of reliability "because of the weight accorded long-standing judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements." *Id.* at ——, 110 S.Ct. at 3147. On the other hand, statements admissible under a state's residual exception satisfy the confrontation clause reliability requirement only if the state establishes that the totality of the circumstances surrounding the making of the statements show the statements were "sufficiently trustworthy"—that is, that it is "particularly likely" that the declarant was telling the truth at the time of making the statements. *Id.* at ——, 110 S.Ct. at 3149–50. Stated differently, the focus is not on all the circumstances, including evidence at trial corroborating the child's statements, but only on those circumstances actually surrounding the making of the statements. These circumstances include, but are not limited to, whether the statements were spontaneous, whether the person talking with the child had a preconceived idea of what the child should say, whether the statements were in response to leading or suggestive questions, whether the child had any apparent motive to fabricate, and whether the statements are the type of statements one would expect a child of that age to fabricate. *Id.* at ——, 110 S.Ct. at 3449–52. Significantly, the Court rejected the contention that a child's extrajudicial statements are per se unreliable for confrontation clause purposes on the ground that the trial court determined the child to be incompetent to testify at trial. *Id.* at ——, 110 S.Ct. at 3151–52. Indeed, the Court said that although a child's incompetence to testify at trial might be relevant to a determination of whether the child's statements possessed particularized guarantees of trustworthiness, a trial court's admission of the statements under a residual hearsay exception carries with it the implied determination that the child was capable of receiving just impressions of facts and relating them truthfully at the time of the making of the statement. *Id.* at ——, 110 S.Ct. at 3151–52.

We believe that the trial court's determination of reliability in this case was justified. S made her initial statement regarding the abuse spontaneously to other children in the foster home. Then, when questioned by her foster mother and others, she consistently described the abuse and said that "David" did it. Details varied, as did statements regarding exactly when the abuse happened, but the basic story remained unchanged. Carlson, the foster mother, had several children of her own, had been a foster mother for 20 years, and had no motive to falsely implicate defendant. When Carlson questioned S in a nonleading way, S said "David" had done it and described him as the "David" who worked for "Pizza Hut," a generic term S used for all pizza places. S also said "David" lived near her house and often sat with her at her mother's house. As we said earlier, S subsequently pointed out defendant's house one day as they drove by it. She also identified defendant as the "David" when she saw him accidentally in the hall at the courthouse on the day of a hearing. Significantly, S had no apparent motive to fabricate. Further, the statements were not the type of statements one would expect a child of S's age to fabricate. Considering the totality of the circumstances relating to the making of the statements, we conclude that the state's evidence established that the child's statements were sufficiently reliable for confrontation clause purposes.

Because S's testimony was unavailable and because her out-of-court statements were sufficiently reliable, we conclude that the trial court properly admitted her statements pursuant to the statute and that defendant's right of confrontation, guaran-

teed by both the Minnesota Constitution and the United States Constitution, was not violated.

■ 2. Defendant's only other contention is that the evidence was insufficient to support his convictions. The only real issue at the trial was whether it was defendant or the other "David" who committed the abuse. The foster mother, Carlson, believed that the "David" S was referring to was defendant because defendant had come to the house and picked up S and her siblings when the children were there for daycare. Other evidence was admitted showing that defendant, and not David Richardson, fit the description provided by S: (a) defendant worked at Domino's Pizza, and S called all pizza places "Pizza Hut," (b) defendant lived near S's mother's house, (c) only defendant, and not David Richardson, sat with S at her mother's house, and (d) S identified defendant upon seeing him in the halls of the courthouse. Viewing the evidence in the light most favorable to the verdict and assuming the jury believed the witnesses for the state and disbelieved any contrary evidence, *State v. Bias*, 419 N.W.2d 480, 484 (Minn.1988), we conclude that the evidence was sufficient. The jury could give substantive effect to the statements of S and could believe Carlson's testimony, the medical testimony, and Richardson's testimony. The jury was free to disbelieve the testimony of defendant and S's mother.

Affirmed.

KELLEY, Justice (dissenting).

I respectfully dissent. Because ordinarily the alleged molestation has occurred in secret, and because the child victim is usually the only eyewitness, successful prosecution of a criminal complaint of child sexual abuse often hinges on overcoming difficult problems of proof. *See In re Nicole V.*, 71 N.Y.2d 112, 117, 518 N.E.2d 914, 915, 524 N.Y.S.2d 19, 22 (1987) *cited in* Myers, Bays, Becker, Berliner, Corwin & Saywitz, *Expert Testimony in Child Sexual Abuse Litigation*, 68 Neb.L.Rev. 1, 3 (1989) [hereinafter *Myers* ]. Not infrequently, the charge is lodged against a trusted custodial adult for sexually assaulting or abusing his (usually) vulnerable victim, almost always in a setting devoid of other witnesses. From this circumstance, the inability to overcome those proof problems occasionally results in findings of exculpability. Understandably, those charged with protecting children seek a method more likely to result in punishment or treatment for those who actually have committed such reprehensible acts of depravity, which often bear *sequelae* not only of permanent damage to the victim, but also, even more remotely, to the lives of others who later may be victimized by the child-scarred victim. *See, e.g., Myers*, 68 Neb.L.Rev. at 139 (citing Berger, *The Child Abusing Family*, 8 Am.J.Fam.Therapy 53, 55 (1980); Jayartne, *Child Abusers as Parents and Children: A Review*, 22 Soc. Work 5 (1977)). Consequently, legislatures have enacted statutes containing procedures designed to ease the prosecutors' proof problems, and courts, as the majority of this court today does, on various grounds, try to sustain those procedures against constitutional challenge. I, too, would be inclined to join in that laudable effort were it not for what I consider to be the constitutional mandate that one accused of any crime, no matter how heinous, has certain constitutional rights which neither the legislature nor the courts may limit or abrogate. Legislatures and courts are both restrained in what actions they may take to ease a prosecutor's burden by the Sixth Amendment to the United States Constitution and by art. I, § 6 of the Constitution of the State of Minnesota. Because I conclude that what was done in this case violates both constitutions by depriving the defendant of his constitutional right to confront the witnesses against him, I respectfully dissent.

The majority opinion, it seems to me, employs an analysis focusing upon the Sixth Amendment to the United States Constitution and federal court cases arising thereunder to conclude that admission of hearsay testimony of this minor who, it should be kept in mind, was ruled to be incompetent to testify in court, did not violate the accused's constitutional confronta-

tional right. I disagree. Nonetheless, while I conclude that what was done in this case did violate the accused's federal Sixth Amendment right, I do not base my dissent on this disagreement. Rather, I base my dissent *solely* upon my view that under art. I, § 6 of the Minnesota Constitution, in this case the accused's Minnesota constitutional confrontational right was violated.[1]

Because in past cases on occasion we have seemingly relied upon federal cases addressing the scope of the Sixth Amendment's confrontation clause, *see, e.g., State v. Hansen*, 312 N.W.2d 96 (Minn.1981), an argument can be made that at least *sub silentio*, we have opted to construe the confrontation clause of art. I, § 6 of the Minnesota Constitution the same as the federal courts have construed the Sixth Amendment to the United States Constitution. I suggest, however, that closer examination of the cases does not support that conclusion. For example, in *Hansen*, we did not address the applicability of art. I, § 6 of the Minnesota Constitution. Although the texts of the two constitutional confrontational clauses superficially appear identical, the history of art. I, § 6 of the

Minnesota Constitution and our cases in Minnesota interpreting it demonstrate that an accused's right to confront his accusers at his trial has a history independent of federal Sixth Amendment interpretation.

In fact, it is only since *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), that the Sixth Amendment has been applied to the states through the Fourteenth Amendment. That is not to say that the history and origins of the right of confrontation under the Sixth Amendment to the federal constitution are of no import to the analysis of our own confrontation clause. To the contrary, the drafters of the Minnesota Bill of Rights deliberately borrowed the words of the Sixth Amendment to the federal constitution in structuring our own confrontation clause. *Debates and Proceedings of the Constitutional Convention for the Territory of Minnesota* 104 (1857) (Republican Convention). Even so, an accused's right to confrontation of his accuser under the Minnesota Constitution does have a history independent of the Sixth Amendment in cases purporting to construe it.[2]

---

1. The actual wording of the clauses ensuring the accused confrontation rights is substantially identical in each constitution. So far as pertinent, the Sixth Amendment reads, "the accused shall enjoy the right to be confronted with the witnesses against him." U.S. Const. amend. VI. Art. I, § 6 of the Minnesota Constitution reads, "The accused shall enjoy the right * * * to be confronted with the witnesses against him." Minn. Const. art. I, § 6. As we noted in *State v. Fuller*, 374 N.W.2d 722, 726 (Minn.1985), "as the highest court of this state, we are independently responsible for safeguarding the rights of [our] citizens." *Id.* (cite omitted). Nevertheless, we there also observed that this obligation

   does not mean that we will or should cavalierly construe our constitution more expansively than the United States Supreme Court has construed the federal constitution. Indeed, a decision of the United States Supreme Court interpreting a comparable provision of the federal constitution, which, as here, is textually identical to a provision of our constitution is inherently persuasive, although *not* of compelling force.

   *Id.* at 726, 727. However, as I try to demonstrate in the text, historically, not only the framers of the Minnesota Constitution, but this court itself has generally tended to maximize the basic constitutional right that an accused be afforded the right to confront the accuser.

2. Delegates elected to serve in the constitutional convention in 1858 were almost equally divided between republicans and democrats with the former having a slight edge. Generally, the democratic delegates were from the north and west part of the territory, had resided in the territory for a longer period of time, and were more experienced in parliamentary procedures with its attendant committee system, whereas the republicans, generally, were comprised of territorial settlers who had resided but a short time in the territory, came from the south and east part of the territory, and, accordingly, had less experience in parliamentary procedures. For those reasons, most of the discussions reported relative, in particular, to the civil rights provisions which appear in the Journal are those before the entire body of the republican convention sitting as a committee of the whole, whereas debates before the committees and subcommittees of the democratic convention remain unreported. Again, generally speaking, there was not much difference between the two groups on most issues, but the republicans exhibited traits of radicalism designed to bring about a more democratic form of government than then existed in any state. It was this radicalism, particularly fears of universal suffrage including negro suffrage, on the part of the democrats that caused the schism. For a fascinating chronicle of these events, *see* W.

The courts of each state are independently responsible to afford the citizens of that state a full panoply of constitutional rights provided by the state's own constitutional provisions in view of policies and conditions particular and peculiar to that state. *See O'Connor v. Johnson,* 287 N.W.2d 400, 405 (Minn.1979) (quoting *California v. Brisendine,* 13 Cal.3d 528, 551, 531 P.2d 1099, 1114, 119 Cal.Rptr. 315, 330 (1975)).

In *California v. Green,* 399 U.S. 149, 174, 90 S.Ct. 1930, 1943, 26 L.Ed.2d 489 (1970) (Harlan, J., concurring), a case involving the breadth of the Sixth Amendment confrontation clause, Justice Harlan of the United States Supreme Court opined that "[h]istory seems to give us very little insight into the intended scope of the Sixth Amendment Confrontation Clause." *Id.* With all due respect I differ from the learned justice's comment. While the complete history of the right of an accused to confront his accuser is not totally known, the right itself certainly is not of recent vintage. The right to confrontation and the resultant right to cross-examination, as a corollary, are part of our tradition of fair play and a means of reaching the truth in the trial. They are nothing new.

More than 2,000 years ago Festus reported to King Agrippa that his predecessor Felix had bequeathed to him a Roman prisoner named Paul and that upon his arrival in Jerusalem the high priest and the chief of Jews informed him against Paul, and besought him. Festus answered: "It is not the manner of the Romans to deliver any man to die, before that he which is accused have the accusers face to face, and have license to answer for himself concerning the crime laid against him."

Pollitt, *The Right of Confrontation: Its History and Modern Dress,* 8 J.Pub.L. 381, 384 (1959) (quoting Acts 25:2). As the author of that article points out, there are many other instances of the right to confrontation in Biblical and Roman history. The author also demonstrates that whether adopted from the Romans or not, the right to confrontation existed in England even before the right to trial by jury, and was clearly established in England by the year 1200. *Id.* at 384–85. By the sixteenth century, various statutes required the evidence of at least two witnesses for conviction. Even in cases where there was only one witness, the court gave great weight to the character of the evidence and the character of the witness offering it, a necessary consequence of which was the right to confront and cross-examine the witness to test credibility. *Id.* at 386–88. Without question, the right to confront adverse witnesses and cross-examine them was clearly established in the English common law more than 400 years ago (approximately 200 years before the Congress passed and the states ratified the Sixth Amendment to the United States Constitution, and 250 years before art. I, § 6 of the Minnesota Constitution was adopted). *Id.* at 381–88.

Backlash to the trial of Sir Walter Raleigh in 1603 is often marked as a precipitating event leading to the inclusion of the Sixth Amendment into the United States Constitution. Raleigh had been accused of treason and a confession of his alleged co-conspirator, Lord Cobham—which had been obtained through torture—was used against him. Cobham later repudiated the

Anderson, *A History of the Constitution of Minnesota,* Chapter IV (Electing and Organizing the Constitutional Convention) and Chapter V (The Convention and the Compromise) (1921). Eventually, a compromise was reached, a conference committee was appointed which reconciled major differences between the republican and democratic versions of the constitution, and one document was supposedly the result. However, because members of one "wing" of the convention refused to sign the document that members of the other "wing" signed, there are actually still two documents which comprise the original Minnesota constitution. Substantially the two are identical, *Id.* at 110, but due to punctuation differences by the scriveners who made the copies signed by the delegates, there exist over 300 minor differences between the two documents. Because the report of the republican "wing" of debates before that body sitting as a committee of the whole are so much more complete than those of the opposite "wing," and because there was no material dispute between the two "wings" on the civil rights provisions of art. I, § 6, in the text of this dissent references are to the republican proceedings.

confession in a letter to Raleigh. Although Raleigh demanded Cobham's presence at his trial, the court refused the request and Raleigh was later executed. *Id.* at 389.

Apparently the right to confront one's accuser existed long before the trial of Raleigh, and even before the right to trial by jury, under English common law. But the right of political prisoners—such as Raleigh—to confront or cross-examine adverse witnesses was not established until the 1600's. In 1637, Quaker Minister John Lilburne, or "Freedom John," was accused of illegally importing into the country books which attacked the Anglican bishops. Upon the attorney general's questioning him concerning the smuggling, Lilburne answered: "I know it is warrantable by the law of God, and I think by the law of the land, that I may stand on my just defence, and not answer your interrogatories, and that my accusers ought to be brought face to face, to justify what they accuse me of." *Id.* at 389–90. The Star Chamber refused to recognize his right to maintain silence until confronted by his accusers. In 1640 when the Parliament was summoned, one of its first acts was to free Lilburne and pass the resolution that "the sentence of the Star Chamber given against John Lilburne is illegal, and against the liberty of the subject: and also bloody, cruel, barbarous, and tyrannical." *Id.* In 1649 Lilburne was charged with treason and at that time he was permitted to confront and cross-examine his accuser. *See id.*

By 1778 this important right was so universally recognized in colonial America that through the Sixth Amendment it became an intregal part of the freedoms guaranteed to the national citizens by the Bill of Rights. It has ever since been recognized as necessary to protect " 'the right physically to face those who testify against him and the right to conduct cross-examination.' " *Coy v. Iowa,* 487 U.S. 1012, 1017, 108 S.Ct. 2798, 2801, 101 L.Ed.2d 857 (1988) (quoting *Pennsylvania v. Ritchie,* 480 U.S. 39, 51, 107 S.Ct. 989, 998, 94 L.Ed.2d 40 (1987)). It likewise intends to " 'ensur[e] the integrity of the factfinding process.' " *Id.* at 1020, 108 S.Ct. at 2802 (quoting *Kentucky v. Stincer,* 482 U.S. 730, 736, 107

S.Ct. 2658, 2662, 96 L.Ed.2d 631 (1987)). Only when a hearsay statement is established as necessary—ordinarily when the declarant is unavailable to testify—and then only if the hearsay statement bears strong evidence of reliability is it admissible. *See State v. Hansen,* 312 N.W.2d at 102–03 (Minn.1984).

Reported debates of each "wing" of the Minnesota constitutional convention do not specifically refer to the foregoing history of this long established recognition of the fundamental importance of the right to confront and cross-examine the accuser. Nonetheless, it appears clear that the delegates were not unaware of the importance and necessity of this right to a citizen accused of having committed a crime. During the constitutional convention, the provision respecting confrontation which eventually became art. I, § 6 of the Minnesota constitution was discussed in a session of the republican body sitting as a committee of the whole and was passed by the membership in the form it exists today. In explaining the meaning of the language, "the accused shall enjoy * * * the right to be confronted with the witnesses against him" a delegate stated:

I refer here again to the Constitution of the United States, framed by wiser heads than ours, and I find the language there used the same as that proposed * * * 'to be confronted with the witnesses against him.' What does that mean? It means that when a charge is made against any person, he may demand that the government shall bring the witnesses before his face, and that they shall there, in his presence and under his eye, make the charge against him.

\*    \*    \*    \*    \*    \*

The provision proposed, cuts off the right of introducing depositions upon criminal trials. In civil cases it is well known, that if the attendance of witnesses is inconvenient, their depositions can be taken, under certain restrictions of law. But the provision that he shall be confronted with the witnesses against him, compels the government to bring

the witnesses bodily into the presence of the accused.

*Debates and Proceedings of the Constitutional Convention* 102–03 (1857) (Republican Convention).

Thus, whatever the confrontation clause under the Sixth Amendment may mean, it seems clear that the Minnesota provision gives strong preference to face-to-face confrontation. Minnesota cases prior to *Pointer v. Texas* demonstrate this preference. In *State v. Hunter*, this court stated:

> [T]hat hearsay evidence is inadmissible in a court of justice, is a rule of fundamental law. It is a rule of the common law, supported * * * by the constitutional guaranty that the accused is entitled to be confronted with the witnesses against him. The wisdom of the rule is not to be questioned or its importance minimized, for its observance is necessary to the protection of litigants and the orderly administration of the law upon the basis of truth, as disclosed by the testimony of living witnesses, and from first rather than second hand evidence.

*State v. Hunter*, 131 Minn. 252, 256, 154 N.W. 1083, 1084–85 (1915) (upheld admission of hearsay evidence under *res gestae* exception).

In *State v. Allison*, 175 Minn. 218, 220 N.W. 563 (1928), this court reversed a conviction because, although there was sufficient evidence of guilt, hearsay evidence was admitted in violation of the defendant's right to confrontation. *Id.* at 222, 220 N.W. at 565. This court continued to recognize the right to confrontation under the Minnesota Constitution up to the time the Sixth Amendment was applied to the states, *see State v. Hines*, 270 Minn. 30, 41–42, 133 N.W.2d 371, 379 (1964), and when improperly denied, it is almost never harmless error. *See State v. Hansen*, 312 N.W.2d at 105; *State v. Shotley*, 305 Minn. 384, 386–87, 233 N.W.2d 755, 758 (1975).

Even in post-*Pointer v. Texas* cases, this court has rested decisions concerning the right to confrontation on both the Minnesota and United States Constitutions. We acknowledged in *State v. Hansen* that the right of confrontation is a fundamental right under both state and federal constitutions. 312 N.W.2d at 102. We there recognized that the primary purpose of the confrontation clause was to prevent depositions or *ex parte* hearsay affidavits from being used in lieu of personal examination and cross-examination of the witness. *Id.* at 103. The purpose of the confrontation clause is not only of

> testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*Id.* (quoting *Mattox v. United States*, 156 U.S. 237, 242–43, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895)).

It seems clear to me from the discussion at the constitutional convention and the case law interpreting Minn. Const. art. I, § 6 that under the Minnesota Constitution, Minnesota strongly prefers that an accusing witness present evidence in court and that the accusation not be permitted by hearsay testimony. This court has repeatedly addressed the primacy of the concerns of the confrontation clause, to ensure that the fact finder has an adequate basis upon which to evaluate the truthfulness of every statement. *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). That goal can only be assured by the presence and testimony of the accusing witness at trial.

Only in certain limited circumstances, may hearsay evidence be admitted without violating an accused's right to confrontation and cross examination.[3]

---

**3.** Among those rare hearsay statements which have been admitted are dying declarations, prior sworn testimony when the same parties have tried the same issue, and statements of co-conspirators made in furtherance of, and during the course of a conspiracy. *See State v. Olson*, 291 N.W.2d 203, 206 (Minn.1980); *see also State v. Daniels*, 380 N.W.2d 777, 782–83 (Minn.1986) (excited utterances).

Reliability of hearsay statements is insufficient to permit admission in violation of the confrontation clause; the declarant *must* be unavailable. *State v. Hansen*, 312 N.W.2d at 102. Without the slightest doubt the alleged child victims, the declarant, was physically available to testify in this case. As I understand the majority, however, it would equate unavailability with incompetence to testify—a nexus which I believe to be unjustified. The trial court apparently ·found the declarant incompetent under Minn.Stat. § 595.02, subd. 1(*l*) (1988). That finding implicitly is based on the alleged child victim's inability to understand the truthfulness of the accusation or inability to form an adequate recollection. Is it not then ironical that hearsay statements made by the child at an even younger age when questioned at an earlier date by doctors, therapists, police officers, counselors, social workers, parents, and foster parents, and then when asked to understand the truthfulness and distinguish between fantasy and reality are deemed admissible because they are reliable and because the child is unavailable? [4] The literature documents that a young child is more vulnerable to suggestion when questioned and more vulnerable to suggestions which stimulate fantasies. *See* Christiansen, *The Testimony of Child Witnesses: Fact, Fantasy, and the Influence of Pretrial Interviews*, 62 Wash.L. Rev. 705, 707 (1987) [hereinafter *Pretrial Interviews*]. Furthermore, a small child is often unable accurately to distinguish among sources of memory. *Id.* at 710 (citing Flavell, Flavell & Green, *Development of the Appearance–Reality Distinction*, 15 Cognitive Psychology 95, 118 (1983); Johnson & Foley, *Differentiating Fact from Fantasy: The Reliability of Children's Memory*, 40 J.Soc.Issues 33, 42–44 (1984) [hereinafter *Fact from Fantasy*] ). For example, research indicates that young children often have difficulty distinguishing memories of things they themselves

have actually said or done from memories of things they have only imagined themselves saying or doing. *Pretrial Interviews* at 710 (citing *Fact from Fantasy* at 45). Therefore, there is a risk that the words or procedures used by an interviewer may move a child to imagine some events or details and that the child will thereafter accept that fantasy as a memory of actual events. *Id.* Of concern is the possibility that a child will accept suggestions from an interviewer who has a preconceived idea that abuse occurred and who imposes that idea on the child through interrogation.

I do not suggest that in this case S, the incompetent child accuser, was deliberately lying nor that the out of court interrogations were anything but well intentioned. However, the child's only statement about the identity of her abuser was made to her foster parent who, so far as the record is concerned, was not an expert in the field of interrogation of young children. The record provides us with no way to judge the suggestive nature or accuracy of the questioning by the foster mother. The foster mother maintains she did not lead S, but she may be unaware that her own actions or wording prompted the child to identify the perpetrator. This is particularly critical because the hearsay testimony was crucial evidence of identification, and was uncorroborated by any other source.

Under these circumstances, mindful of the strong prejudice against hearsay evidence under the Minnesota Constitution, I must conclude that the defendant's right of confrontation was violated. Stipulated incompetency—or even a court finding of incompetency, when based on an erroneous understanding of statutory incompetence "is too uncertain a basis to find unavailability. To excuse production of a witness whose testimony is offered against a criminal defendant through hearsay repetition, a more certain showing is required." *State v. Ryan*, 103 Wash.2d 165, 172, 691 P.2d

---

4. This court has noted its concern with the potential hazards in questioning impressionable children. *State v. Conklin*, 444 N.W.2d 268, 276 (Minn.1989). It seems to me those hazards, when considered in the light of the devastating consequences to the life of the accused should the accusation be false, buttress the necessity for demanding compliance with the clear mandate of the confrontation clause.

197, 203 (1984). Rather than hold that a child is incompetent to testify, the testimony should be admissible for the jury to judge its worth. "The trier of fact should be permitted to determine the weight and credibility to be given to the testimony" of the child victim. National Legal Resource Center for Child Advocacy and Protection, American Bar Association. *Recommendations for Improving Legal Intervention in Intrafamily Child Sexual Abuse Cases*, § 4.1 (J. Bulkley ed. 1982).[5]

> Recognizing on the one hand the childish disposition to weave romances and to treat imagination for verity, and on the other the rooted ingenuousness of children and their tendency to speak straightforwardly what is in their minds, it must be concluded that the sensible way is to put the child upon the stand to give testimony for what it may seem to be worth.

2 J. Wigmore, *Wigmore on Evidence*, § 509 at 719 (Chadbourn rev. 1979). Stated another way, to protect a defendant's constitutional right to confrontation, the term 'incompetent witness' should be interpreted to include only child witnesses who do not have the ability to currently recall and relate facts in issue, rather than child witnesses who do not adequately understand the responsibility to tell the truth when testifying. In this way, the out-of-court statements made by the child can be judged in the light of the child's in-court testimony and demeanor.

I am not unmindful of the frustration of a society attendant to a court decision which, if wrong, has great potential to revictimize or traumatize a small child. I recognize that in enacting Minn.Stat. § 595.02, subd. 3 (1988) the legislature made an effort with a legitimate end—the protection of child victims as witnesses, but a legitimate end in and of itself never justifies diminution of constitutional rights. *Long v. Texas*, 742 S.W.2d 302, 321 (Tex.Cr.App. 1987), *reversed on other grounds, Briggs v. Texas*, 789 S.W.2d 918 (Tex.Cr.App.1990). Nor are courts permitted to ignore or to refashion constitutional provisions guaranteeing an accused a confrontational right in order to ensure convictions; constitutional rights afforded those accused of crimes cannot be negated by well-intentioned statutes or by court rules of evidence, nor by well-intentioned zeal to protect abused child witnesses.

Because the constitutional debates make clear the founders meant what they said in art. I, § 6 about confrontation rights, and because the court has historically construed the confrontation clause with its concomitant right of cross-examination as broadly as possible in favor of affording actual confrontation, I would reverse based solely on art. I, § 6 of the Minnesota Constitution.

POPOVICH, Chief Justice (dissenting).

I join in the dissent of Justice Kelley. *See State v. Conklin* also.

YETKA, Justice (dissenting).

I join in the dissent of Justice Kelley by reason of this court's decision in *State v. Conklin* as well.

---

5. At least 13 states have done away with the competency requirement. Note, *The Testimony of Child Victims in Sex Abuse Prosecutions: Two*

*Legislative Innovations,* 98 Harv.L.Rev. 806, 819 n. 89 (1985).