*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0745**

State of Minnesota,
Respondent,

vs.

Arne Henry Mahlberg,
Appellant.

**Filed March 28, 2016
Affirmed
Kalitowski, Judge***

St. Louis County District Court
File No. 69DU-CR-14-3308

Lori Swanson, Attorney General, Michael Everson, Assistant Attorney General, St. Paul, Minnesota; and

Mark Rubin, St. Louis County Attorney, Duluth, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Andrea Barts, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Bjorkman, Presiding Judge; Halbrooks, Judge; and Kalitowski, Judge.

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**KALITOWSKI**, Judge

Appellant Arne Henry Mahlberg challenges his convictions of first- and second-degree criminal sexual conduct, arguing that the district court erred by admitting a recording of the victim's out-of-court statements to a forensic interviewer because the statements were not particularly trustworthy or reliable. We affirm.

## DECISION

Arne Mahlberg was convicted of two counts of first-degree criminal sexual conduct and two counts of second-degree criminal sexual conduct. *See* Minn. Stat. §§ 609.342, subd. 1(a, g), .343, subd. 1(g) (2014).[1] The victim of Mahlberg's offenses is N.J.M., the step-granddaughter of his live-in girlfriend, C.W. N.J.M. was born on October 30, 2006; she stated that she was between the ages of four and seven when Mahlberg committed the offenses.

C.W. is the mother of N.J.M.'s stepfather. N.J.M. refers to C.W. as "grandma" and Mahlberg as "grandpa." Until N.J.M. disclosed the allegations, C.W. provided daycare for N.J.M. at her home, which she shares with Mahlberg, while N.J.M.'s mother worked full-time. Although C.W. was typically the primary caretaker while N.J.M. stayed at her home, Mahlberg occasionally cared for N.J.M. alone.

Two weeks after N.J.M. disclosed the allegations to a school counselor, forensic interviewer Laura Gapske interviewed her. N.J.M. disclosed various occasions of sexual

---

[1] Because the statutes of conviction did not change over the course of Mahlberg's conduct, we cite the current versions.

abuse by Mahlberg during the interview. She reported that Mahlberg first touched her inappropriately while they were in the bathroom cleaning the dog's dish; she stated, in age-appropriate terms, that Mahlberg touched her bare vagina and inserted his finger into her anus. On a separate occasion, he undid his belt, exposed his penis, and hugged her to his body, pressing his bare penis to her bare stomach; on the same incident, he forced her hand around his penis. On another occasion, she reported that Mahlberg again touched her anus by inserting his hand down the back of her skirt while she was showing him a video on the computer. She also reported that Mahlberg once penetrated her anus and her vagina with his penis, causing blood to come out when she next urinated. On another occasion, she stated that Mahlberg kissed her vagina through her clothes. Finally, she disclosed that Mahlberg had shown her a digital photo of himself naked.

The state charged Mahlberg with seven offenses: three counts of first-degree criminal sexual conduct, three counts of second-degree criminal sexual conduct, and one count of solicitation of a child to engage in sexual conduct.

On the first day of trial, N.J.M. testified. N.J.M. was unable to recall many of the details of her disclosures to Gapske in her testimony. After N.J.M. testified, the state moved to admit the recording of the Gapske interview under the residual hearsay exception, Minnesota Rule of Evidence 807. Following an evidentiary hearing, the district court ruled the video admissible. The residual exception to the rule prohibiting hearsay allows admission of statements not falling under one of the accepted hearsay exceptions that (1) have "equivalent circumstantial guarantees of trustworthiness," (2) are evidence of a material fact, (3) are more probative on that point than any other evidence that is attainable

3

by reasonable methods, and (4) serve the interests of justice and the general purpose of the rules of evidence. Minn. R. Evid. 807. In applying the residual exception to admit evidence, "[t]he court should make findings explicitly on the record unless there is a waiver . . . or the basis of the ruling is obvious." *State v. DeRosier*, 695 N.W.2d 97, 105 (Minn. 2005) (quotation omitted).

"Evidentiary rulings rest within the sound discretion of the [district] court and will not be reversed absent a clear abuse of discretion. On appeal, the appellant has the burden of establishing that the [district] court abused its discretion and that appellant was thereby prejudiced." *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003) (citation omitted); *see also State v. Ahmed*, 782 N.W.2d 253, 259–60 (Minn. App. 2010) (reviewing admission of a sexual-abuse victim's extrajudicial statements for abuse of discretion).

Here, Mahlberg challenges the district court's ruling on the recording's circumstantial guarantees of trustworthiness. "[W]hether the circumstances surrounding the making of the statements . . . show that the statements possessed particular guarantees of trustworthiness" is a legal question, which we review de novo. *State v. Salazar*, 504 N.W.2d 774, 776–77 (Minn. 1993) (quotation omitted). To admit an extrajudicial statement under rule 807, the statement's proponent must establish that "it is particularly likely that the declarant was telling the truth at the time of making the statements." *Ahmed*, 782 N.W.2d at 261 (quotation omitted). To determine whether the extrajudicial statement has circumstantial guarantees of trustworthiness equivalent to other hearsay exceptions, we follow the totality-of-the-circumstances approach, accounting for "all relevant factors

4

bearing on trustworthiness." *State v. Robinson*, 718 N.W.2d 400, 408 (Minn. 2006) (quotation omitted).

"The relevant circumstances under rule 807 are 'those circumstances actually surrounding the making of the statements.'" *Ahmed*, 782 N.W.2d at 260 (quoting *State v. Lanam*, 459 N.W.2d 656, 661 (Minn. 1990)). Minnesota cases enumerate several relevant circumstances in child-abuse cases:

> whether the statement was spontaneous, whether the questioner had a preconceived idea of what the child should say, whether the statement was in response to leading questions, whether the child had any apparent motive to fabricate, whether the statements are of the type one would expect a child of that age to fabricate, whether the statement remained consistent over time, and the mental state of the child at the time of the statements.

*Id.*; *see also Robinson*, 718 N.W.2d at 410 (applying these factors to assess extrajudicial statement).

After entertaining arguments from counsel, hearing forensic interviewer Gapske's testimony, and viewing the interview recording for the purposes of the motion hearing, the district court ruled it admissible. In analyzing the statement on the record, it noted that the interview occurred because N.J.M. self-reported a "bad touch." It further emphasized Gapske's testimony, including her description of the protocols employed to ensure the trustworthiness of an interview, her minimal knowledge of the allegations, and her impression that N.J.M.'s disclosures were spontaneous. The court concluded that appropriate protocols, including the avoidance of leading questions, had been followed. N.J.M.'s demeanor was consistent throughout, and no motive to fabricate was presented at

5

the interview. Later, in a thorough and well reasoned Findings of Fact, Conclusions of Law and Order, the district court reiterated that the recording "had equivalent circumstantial guarantees of trustworthiness based on the interview protocol utilized by Ms. Gapske and the spontaneity of N.J.M.'s statements."

Mahlberg argues that the district court committed reversible error by admitting the recording because its contents were not particularly trustworthy or reliable, relying on application of the factors enumerated in *Ahmed*. Specifically, he contends that the statements were not spontaneous, Gapske knew of the specific allegations before the interview, Gapske's questions were not general, and N.J.M. had not consistently told the same story. He contends the recording's admission was highly prejudicial and he is therefore entitled to a new trial. We disagree.

Applying the *Ahmed* factors, the district court's conclusion that the recording had equivalent circumstantial guarantees of trustworthiness to other hearsay exceptions is well supported by the record. Gapske's testimony, particularly her description of the interview protocols, supports the district court's conclusion. Accordingly, we summarize the relevant portions of Gapske's testimony regarding the interview protocol before applying the *Ahmed* factors to the recording.

**Interview Protocol**

Gapske testified that the interview followed a research-based "RATAC" forensic protocol. Each letter of the RATAC acronym stands for a distinct stage of the interview.

6

During the first, rapport-building stage, the interviewer's goals are to get the child comfortable, reiterate to the child the importance of correcting the interviewer when appropriate, and assess the child's communication style and abilities.

In the next stage, the anatomy-identification stage, the interviewer uses a drawing of male and female bodies to elicit the words the child uses for different parts of their body. Gapske testified that the interviewer uses the child's body-part terms throughout the interview because that reduces the child's suggestibility to an adult's use of different words and because the interviewer wants the child to be comfortable using their own words.

During the next stage of the RATAC protocol, the touch inquiry, the interviewer asks the child "about touches that they like to get on their body," and after a few such scenarios, about "touches that they don't like." Following the touch inquiry is the abuse-scenario stage; during this stage the interviewer explores any disclosures the child has made. Finally, in the closing stage, the interviewer identifies safe people in the child's life, in whom they could confide if necessary.

Gapske testified that the protocol is intended to be adaptable to the child; the interview generally follows the protocol in order unless the child makes a spontaneous disclosure. In the event of a child's spontaneous disclosure, the interviewer follows the child's lead and "go[es] right into abuse disclosure, no matter when the child discloses during the interview." Ideally, the interviewer will ask only open-ended, non-leading questions, but other question types may be used as necessary to clarify the details of a disclosure.

With the interview protocols in mind, we next apply the *Ahmed* factors to the recording of N.J.M.'s interview.

**Spontaneity of the Statements**

Gapske testified that N.J.M.'s disclosures of abuse were spontaneous. She further testified that she diverted from the chronological RATAC protocol during N.J.M.'s interview because N.J.M. made a spontaneous disclosure during the rapport-building stage. The transcript of the recording corroborates her testimony: N.J.M. tells Gapske that her sister is coming to town the next week, that her sister will be upset because they cannot go to C.W.'s house, and they cannot go to C.W.'s house because Mahlberg was "doing bad stuff" to her.

The transcript and the recording show that N.J.M. volunteered the allegations without prompting. Before volunteering the first allegation, N.J.M. had only been instructed that everything said in the room had to be the truth. Subsequent allegations arose at N.J.M.'s discretion, consistent with the protocol, amidst her tangential comments regarding pets, family traditions, and toys. Moreover, when asked what she'd been told before the interview, N.J.M. responded that her mother had simply told her that she had an appointment and that N.J.M. would "see . . . what the appointment was about. It's not a doctor's appointment, it's just a different appointment. . . ." Sufficient evidence shows that N.J.M.'s statements were spontaneous.

**Preconceived Ideas of the Questioner**

Gapske testified that, going into the interview, consistent with the protocol, she knew only the information contained in the intake report: that N.J.M. had disclosed

8

allegations of abuse by her grandpa to a school counselor. Gapske's questions throughout the transcript reflect that she did not learn of the number of instances of abuse, the location, or N.J.M.'s age at the time of the offenses until N.J.M. disclosed those details to her.

Additionally, the transcript shows that despite Gapske's knowledge that Mahlberg was the alleged perpetrator, she never disclosed this knowledge to N.J.M.; instead, the video shows that Gapske simply followed N.J.M.'s lead. Contrary to Mahlberg's contention that "Gapske's knowledge of N.J.M.'s allegations, and her role to obtain evidence, is indicative of the untrustworthy nature of N.J.M.'s statements," the interviewer's mere knowledge of the alleged perpetrator's identity does not render the statements unreliable. *See Lanam*, 459 N.W.2d at 661 (noting reliability of victim's disclosure to police where she consistently identified the defendant as the abuser before forensic interview). The record shows that Gapske's minimal preconceived ideas of the allegations did not influence N.J.M.'s statements.

**Method of Questioning**

The transcript of the recording shows, and the video confirms, that Gapske used non-leading, general questions to interview N.J.M. When N.J.M. disclosed an allegation, Gapske would repeat it back to N.J.M. in the same terms, and follow up by asking N.J.M. to tell her more about it.

Moreover, Gapske openly asked N.J.M. to correct her, if necessary, and consistently thanked N.J.M. for correcting her to encourage such behavior. During the interview, the only questions containing references to the allegations came in response to N.J.M.'s own descriptions of what happened. For example, when N.J.M. said that her grandpa "was

doing bad stuff" to her, Gapske repeated it back to N.J.M. in the form of a question and then said "tell me more about your grandpa doing bad stuff to you." Accordingly, in the context of the entire interview, Gapske's questions simply echo N.J.M.'s own language and are not suggestive in nature so as to render N.J.M.'s statements unreliable.

**Viability of Fabrication**

The state asserts, and we agree, that a seven-year-old girl would be unable to describe the conduct and her own reactions to Mahlberg's conduct that N.J.M. details in her interview in the absence of abuse. N.J.M. told Gapske that Mahlberg put his penis into where her "pee comes out" and that it felt like it went all the way up into her stomach, "right into [her] belly button." She stated that he inserted his finger into her "butt hole" and then told her to smell his finger. When asked how that made her body feel, she said "it kind of hurted my butt and it made me feel like I'm going to throw up." She stated that, on multiple occasions, he asked her if she liked him touching her in that way, to which she first responded that she didn't, and later "no, you already asked me that and I said no."

Further, N.J.M.'s mother testified that N.J.M. generally liked going to C.W.'s house, where Mahlberg lived; her testimony reflected no possible motive to fabricate the statements. Indeed, N.J.M. expressed remorse because her sister would be upset that they could not go to C.W.'s house. These circumstances support the district court's conclusion that N.J.M. had no reason to fabricate the statements, thus contributing to their reliability.

**Consistency of the Statements**

Here, as in *Lanam*, N.J.M.'s details and dates varied, as did her ability to disclose the allegations. 459 N.W.2d at 661. But as in *Lanam*, her "basic story remained

10

unchanged." *Id.* She consistently alleged that her grandpa had touched her inappropriately; first to her school counselor, then to Gapske, and her later testimony—though she had difficulty recalling the specifics of her allegations on the stand—was consistent with this. We conclude that this factor did not detract from the reliability of N.J.M.'s statements.

**Mental State of the Child at the Time of the Statements**

The video shows that N.J.M.'s demeanor throughout the interview was consistent: she appears open, engaged, calm, and candid. Nothing about her mental state suggests that her statements were not reliable.

In sum, the district court properly assessed the *Ahmed* factors in deciding to admit the recording of the Gapske interview. The district court's detailed findings are amply supported by the record and the recording of the interview. Accordingly, it did not abuse its discretion in admitting the recording.

**Affirmed.**

11