STATE of Minnesota, Respondent,

v.

Willie R. BIAS, Jr., Appellant.

No. C9–87–1249.

Supreme Court of Minnesota.

Feb. 12, 1988.

C. Paul Jones, State Public Defender, Melissa Sheridan, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Vernon F. Bergstrom, Chief, Appellate Section, Lisa A. Berg, Asst. Co. Atty., Minneapolis, for respondent.

## OPINION

POPOVICH, Justice.

Willie Bias, Jr., appeals his conviction for first degree murder while committing or attempting aggravated robbery, a violation of Minn.Stat. § 609.185(3) (1986). Appel-

lant contends (a) the evidence, entirely circumstantial, does not support the jury's verdict; (b) the indictment was constitutionally flawed; and (c) the trial court erroneously allowed him to be impeached with evidence of a prior felony conviction. We affirm on all three grounds.

Appellant's main claim of insufficient evidence requires a detailed review of the facts. On Saturday, October 18, 1986, at 11:43 p.m., the Minneapolis Fire Department received a call reporting a fire at 32 Spruce Place. The call was placed by Charles Swenson, who lived on the third floor of an adjoining building and could see into a window of Apartment 301 at 32 Spruce Place. Swenson heard a noise at his window and when he looked out noticed a bright orange flash, followed by smoke, in the window across the courtyard. He called 911, then hurried to the burning apartment and opened the unlocked door. Swenson tried to crawl in, but cut himself on broken glass and became overwhelmed by smoke. Before leaving, he saw what he thought was a person's leg.

Fire department officials arrived shortly thereafter and, while subduing the fire, found a body slumped over the arm of a sofa in the living room. The body, charred beyond recognition, was later identified by dental records as Robert Churchill, the apartment's tenant. An October 19 autopsy revealed a stab wound to the heart, as well as fractured cartilage and bleeding in the neck, consistent with strangulation. Low carbon monoxide levels in the body and normal lungs showed Churchill died before the fire began. The medical examiner opined the stab wound was the cause of death. Fire investigators found no trace of accelerants, but believed the fire was probably intentional, given the evidence of homicide. They also believed the fire originated on the sofa at the end where the body was found, as that area showed the greatest charring. A knife was found in the ashes near the sofa, but was burned so badly no blood could be recovered. There was no evidence of forced entry.

Minneapolis Police Detective Charles Miles initiated the homicide investigation.

On Monday, October 20, he and another officer went to the Speakeasy Bar on Hennepin Avenue, looking for people who knew Robert Churchill. The officers approached a woman crying on the sidewalk outside the bar, who told them she was a good friend of Churchill's and had been with him at a party Saturday night. She had just learned of the death from the Speakeasy's bartender. The woman, Bonnie Bender, identified three other people who had been at the party: a black man named Eric, a man she knew only as Willie, and another she referred to as "the Mexican." She also described a submachine gun Churchill owned and passed around at the party, but which was not recovered in the apartment after the fire.

Within a few days, police located Erasmo (Eric) Diaz Delaluz and Jerry Wittner ("the Mexican"), who confirmed Bender's report. Bender and Delaluz identified Bias from a photo lineup as the "Willie" who had also been present, but police could not find him. Sgt. Miles contacted Bias' sister, Lenore Stukel, telling her Bias was wanted in connection with a burglary. Bias called Stukel twice in October and asked if anyone was looking for him, but refused to tell her precisely where he was. When Bias called Stukel once more, he told her he was in Baton Rouge, Louisiana, after she said she might need to contact him if something happened to their ailing grandfather. Stukel relayed that information to Miles and Bias was arrested by Baton Rouge authorities under a Minnesota second degree murder warrant. Bias waived extradition and *Miranda* rights, and on November 17, 1986, submitted to questioning in Baton Rouge by Sgts. Miles and DeConcini of the Minneapolis Police Department. A grand jury indicted Bias on one count of premeditated murder and one count of murder while committing aggravated robbery, both constituting murder in the first degree.

At trial, the four guests at Churchill's party related the events of October 18, 1986. Around 11:00 a.m. that day Bias went to the Speakeasy Bar on Hennepin Avenue. There he approached Bonnie Bender, whom he did not know, and invited her to play pool. Two or three hours later, Robert Churchill came in and greeted them. Bender had known Churchill for several years and considered him "like my brother." Bias also knew Churchill, who housed Bias for a short time in 1985 after Bias was released from prison. After a few drinks, Churchill suggested they all go to his apartment along with two others in the bar, Jerry Wittner and Bender's friend Eric Delaluz. Delaluz had other business, but agreed to join them later.

Late that afternoon, Churchill, Bender, Wittner and Bias left the Speakeasy to go to Churchill's apartment at 32 Spruce Place, where they drank and talked into the evening. At one point, Churchill asked Bender if she wanted to see his "baby." Bender said, "Sure," and Churchill retrieved from the bedroom a large case apparently carrying a musical instrument. The case actually contained a semi-automatic submachine gun which Churchill passed around the group, then put back in the case. When Delaluz arrived, Churchill again brought out the gun and passed it around the room. Appellant put the gun away in the bedroom.

Witnesses testified appellant later approached Delaluz and said something about selling the gun and that "he had to have it." Delaluz, a Cuban national with poor English, did not fully understand appellant, but Bender overheard the conversation and thought appellant wanted to steal the gun and have Delaluz help "get rid of it." Bender angrily confronted appellant and informed Churchill, but appellant denied the accusation, saying he wanted only to buy the gun for resale at a profit. Appellant testified Delaluz was a potential buyer. According to Bender, Churchill said he would kill appellant if he tried to steal the gun.

Sometime after the argument, Delaluz said he needed to buy cigarettes and wanted to leave. Bender asked Churchill to accompany them to the Speakeasy, but Churchill said he was drunk and wanted to stay home. Bender told Bias he had to leave too, but Bias wanted to stay and talk with Churchill. Bender asked Churchill

which he preferred, and Churchill said he wanted everyone to go.

Evidence of subsequent events is conflicting. According to Bender, she picked up the phone and threatened to call the police, whereupon Bias "disappeared." Everyone else was still in the living room and heard a door click. Bender, Delaluz and Wittner then left, though Bender stood outside the door until she was sure Churchill locked it. She and the others hurried down the steps to confront Bias again, but could not find him. Wittner left on his bicycle and Bender and Delaluz left for the Speakeasy about 10:30 p.m.

Bias testified he agreed to leave but went first to the bathroom, then to the kitchen to get beer. According to Bias, Bender followed him around the apartment and stood at the door until he was on his way down the steps. He was afraid the group would "gang up" on him, and hurried to nearby Loring Park. Bias said he sat near the fountain to drink his beer and was joined by a man he recognized from Personal Contractors, Inc. (PCI), an agency through which he had obtained temporary work in previous weeks. Bias gave the man a beer and confessed he had slashed the tires on PCI vans recently. After one or two hours, Bias testified, he headed home to Portland Avenue and Ninth Street, walking down Yale Place and through the parking lot of the MacPhail Music Center.

Bias' testimony at this point agrees with that of Minneapolis Police Officer Paul Peterson, who encountered Bias in the MacPhail lot. Peterson was in the area investigating a call he received around 11:25 p.m., about a man shooting a gun near Hennepin Avenue and 13th Street. He stationed his car at the dead end of 13th Street just east of Yale Place, and saw a person cross 13th Street a block away on Harmon Place. The person was carrying what Peterson thought might be a gun case, but Peterson did not believe this person was the subject of his 11:25 p.m. call. He then slowly drove up 13th Street to Harmon and turned right, continuing to follow the person nearly a block ahead of him. The person turned right onto 12th Street, but when

Peterson turned, after stopping for a red light, the person was nowhere in sight. Thinking the person might have stepped into a building on 12th Street, Peterson pulled into the MacPhail Center lot to turn around and continue his search. As he did so, he saw a man at the end of the parking lot. Peterson pulled the car toward the man, Bias, who also approached Peterson. Bias was wearing a baseball cap and dark blue windbreaker with the words "Rainbow Bowl" on the back that he testified he wore to the Speakeasy earlier. Peterson could only describe the gun-carrier's clothing as dark.

Peterson asked Bias if he had seen anyone meeting the description given in the earlier call. Bias testified he lied and said yes, because he was drunk and was afraid of arrest. Bias then asked where he could buy cigarettes, and Peterson pointed him toward the nearby Luxeford Hotel or JR's bar. Bias testified he went to the Luxeford, bought cigarettes, and walked directly home.

After Bias left, Peterson logged the earlier call, then glanced out his window and noticed a hard-sided gun case leaning against the MacPhail Center Annex. Peterson opened the case and found a submachine gun, which witnesses later identified as Robert Churchill's. Peterson put the gun in his trunk and tried to find Bias, the man he had just encountered. After about five minutes of searching, he met some other officers and overheard a 12:02 a.m. call to their squad car about a fire at 32 Spruce Place.

Bias' testimony about Loring Park and the MacPhail Center encounter conflicts with his November 17 statements to Sgt. Miles. Asked then about the party, Bias said there had been no argument and he left before the others. He said he walked to Hennepin Avenue to go drinking, but changed his mind and walked home straight down 9th Street. Bias denied talking to a policeman in the MacPhail Center area, saying he talked to no one on his way home. At trial, Bias testified the earlier statements were wrong because he was

confused and "just kind of flipped out" upon hearing the murder charge.

The day after the party, Sunday, Bias left Minneapolis and hitchhiked to Texas although three days earlier he had rented an apartment in Minneapolis on a monthly basis. Bias testified he was planning to leave in a few days and had looked for weekly accommodations, but could not find any with laundry facilities and individual mailboxes; he rejected flop houses because he "can't handle them." Using money from the sale of his truck, Bias rented an efficiency he thought more desirable and paid through November 16, 1986. According to the building manager, Bias asked if he could carpet and paint the apartment. Bias bought dishes, silverware, and canned food and retrieved a small black and white TV set from storage at the bus station.

After moving in, Bias discovered the building lacked mailboxes, and laundry facilities had to be reserved several days in advance. Unhappy with the situation, he decided to leave. At about 9:30 a.m. on Sunday, he went to the building manager and asked for his $25.00 deposit, saying he had an emergency. She told him the main office would mail it to him, but Bias had no forwarding address. Bias then went to the Francis Drake Hotel, looking for someone to sublet the apartment. He met several transients with whom he exchanged the keys and rent receipt for $5.00 and a half-ounce of marijuana. Two of the transients testified Bias told them he was "hot," meaning wanted by the law. Bias testified he told them he wanted to leave for someplace hotter because it was getting cold in Minneapolis. He left them the dishes, food and some old clothes.

At around 11:00 a.m., Bias began hitchiking on Interstate 35W. Chester Eddins picked him up at around 5:30 or 6:00 p.m. and drove him all the way to Texas, where he stayed in Eddins' home and did maintenance work for four days. He then hitchhiked to another Texas town, and two days later to Baton Rouge, Louisiana, where he got a lawn maintenance job. He was arrested on the murder charge there in November.

## I.

■ Bias contends his conviction rests on pure speculation and circumstantial evidence and thus cannot stand. We recently summarized the general standard of review on a claim of insufficient evidence in a criminal case. *State v. Race*, 383 N.W.2d 656 (Minn.1986). We must determine whether, under the facts in the record and any legitimate inferences that can be drawn from them, a jury could reasonably conclude the defendant was guilty of the offense charged. *Id.* at 661. We must view the evidence in the light most favorable to the prosecution and assume the jury believed the state's witnesses and disbelieved any contrary evidence. *Id.; State v. Flores*, 418 N.W.2d 150 (Minn.1988).

■ A conviction based on circumstantial evidence merits stricter scrutiny. The evidence is entitled to the same weight as any evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of guilt. *Race*, 383 N.W.2d at 661. The conviction may stand only where the circumstances form "a complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt." *State v. Wahlberg*, 296 N.W.2d 408, 411 (Minn.1980). This stricter standard, though, "still recognizes a jury is in the best position to evaluate the circumstantial evidence surrounding the crime." *Race*, 383 N.W.2d at 662. As in all cases, the jury determines the credibility and weight given to the testimony of individual witnesses. *State v. Daniels*, 361 N.W.2d 819, 826 (Minn.1985); *State v. Engholm*, 290 N.W.2d 780, 784 (Minn.1980).

Bias claims the record fails to show he intended to harm or steal from Churchill. The party guests' testimony, he asserts, demonstrates nothing more than his desire to acquire the gun by lawful means. While the party testimony alone is not conclusive, it certainly demonstrates Bias' intense interest in the gun. The jury was in a posi-

tion to assess Bender's credibility, and could reasonably have believed her account, which was generally corroborated by other witnesses (*e.g.*, Wittner's testimony that Bias treated the gun "like a little kid after a bag of candy"). The jury likewise could have believed Bender's testimony that guests were in the living room and heard the door click as Bias apparently left the apartment. This evidence, and evidence of no forced entry, is consistent with the state's theory that Bias swung the door shut from the inside, then proceeded down a short hallway to the bathroom where he hid until the others left. Though Bias testified Bender accompanied him to the door, his vested interest in having a witness to his departure provides substantial grounds to doubt his story. *See State v. Langley*, 354 N.W.2d 389, 394 (Minn.1984).

Bias also dismisses his encounter with Officer Peterson in the MacPhail Music Center parking lot as an unfortunate coincidence with no probative value, considering Peterson's inability to describe the person he saw carrying the gun case. However, the location of the gun in relation to Bias and the timing of events that night allowed the jury to infer that Bias saw the squad car following him, cut through the alley, and dropped the gun shortly before Peterson entered the parking lot. More importantly, inconsistencies in the evidence cast doubt on any alternative hypothesis. Bias testified he walked from Loring Park down Yale Place to arrive in the MacPhail lot at the same time as Peterson. Peterson, however, was parked just off Yale Place several minutes earlier and would almost certainly have seen Bias somewhere along that street. Peterson apparently saw no one else that night other than a crowd leaving a bus at the nearby Luxeford Hotel, and Bias himself saw no one in the alley or parking lot near where the gun was found. Peterson spotted appellant just moments after he last saw the guncarrier, who must have been near the parking lot at roughly the same time.

Bias' credibility is further undermined by the conflicting story he gave Sgt. Miles in Baton Rouge, at a time when he was not aware that Officer Peterson had confirmed Bias' presence in the MacPhail lot. When Miles asked Bias to show him on a map how he walked home, Bias described a path that avoided the MacPhail Music Center and denied talking to a police officer. Bias attributes those "omissions" to fright and confusion, but such "[s]ignificant inconsistencies in appellant's statements to authorities substantially diminished the credibility" of his story. *State v. Race*, 383 N.W. 2d 656, 662 (Minn.1986). Assessment of credibility is left to the jury, which was fully apprised of discrepancies in the evidence. *See State v. Daniels*, 361 N.W.2d 819, 827 (Minn.1985).

Bias further claims "there is absolutely nothing suspicious" about his departure from Minneapolis the day after the party, as he was a drifter with no permanent home and had been planning to leave for warmer weather. Nevertheless, evidence of flight suggests consciousness of guilt. *State v. Meany*, 262 Minn. 491, 502, 115 N.W.2d 247, 255 (1962); *State v. French*, 400 N.W.2d 111, 116 (Minn.App. 1987). The jury could and apparently did find the circumstances surrounding his abrupt departure to be incriminating. Bias had only three days earlier rented an apartment and exhausted his money on rent and furnishings. He explained his actions partly through dissatisfaction with mail facilities at the apartment, but admitted he hadn't received mail in a long time, then equivocated about whether or not he was expecting mail. Transients who sublet appellant's apartment claimed he told them he was "hot"; appellant disputes their testimony, but the jury apparently believed them and could reasonably have done so. *See State v. Daniels*, 332 N.W.2d 172, 180 (Minn.1983). The jury could also reasonably dismiss the relatively minor PCI tireslashing incident as the explanation for appellant's evasive telephone calls to his sister. Moreover, appellant's behavior after the offense cannot be isolated from the rest of the evidence, the cumulative effect of which negates any rational hypothesis other than guilty flight.

Similarly, lack of physical evidence connecting appellant to the crime does not

undermine the verdict. Evidentiary gaps are largely products of the fire, a result obviously intended by the offender. Any gaps, moreover, fail to support a reasonable inference other than guilt, given the implausibility of an alternative offender who somehow gained access to the apartment after 10:30 p.m.; murdered Churchill and started the fire; stole the gun but ignored other valuable items in plain sight; and escaped notice when abandoning the gun in the MacPhail Center parking lot within moments of appellant and Officer Peterson's meeting there.

To successfully challenge a verdict based on circumstantial evidence, a convicted criminal must show his claim is consistent with a rational hypothesis other than guilt. *Race*, 383 N.W.2d at 662. After reviewing the evidence as a whole, and assuming the jury believed the state's witnesses, we hold appellant did not meet that test.

## II.

Appellant next argues his conviction must be overturned because the indictment was constitutionally inadequate. The trial court denied his pretrial motion to dismiss the indictment, which he claimed insufficiently informed him of the nature and cause of the accusations against him.

■ Minnesota Rules of Criminal Procedure require that indictments contain "a written statement of the essential facts constituting the offense charged." Minn.R.Crim.P. 17.02, subd. 2. Under Minn.Stat. § 628.18(6) (1986), an indictment is sufficient if it meets the requirements of Rule 17.02 and "the act or omission charged as the offense is clearly and distinctly set forth, in ordinary and concise language, without repetition." An indictment offers two major protections and is ultimately tested on that basis: whether it apprises the defendant of what he must be prepared to meet, and whether the record shows with accuracy that subsequent prosecution on the offense is barred. *State v. Oman*, 265 Minn. 277, 281, 121 N.W.2d 616, 620 (1963), citing *Russell v. United States*, 369 U.S. 749, 763, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962). However, we have also stressed that a conviction after a fair trial will stand unless there is actual proof that defendant has in fact been misled as to the charge brought against him, to his prejudice. *State v. Clark*, 270 Minn. 538, 552, 134 N.W.2d 857, 867 (1965); *see also State v. Becker*, 351 N.W.2d 923, 927 (Minn.1984); Minn.R.Crim.P. 17.02, subd. 3. We may reverse if the charge was so vague as to make it impossible for the defendant to defend himself. *Id.; State v. Waukazo*, 269 N.W.2d 373, 375 (Minn.1978).

■ Appellant's indictment charged "[t]hat on or about the 18th day of October, 1986, in Hennepin County, Minnesota, Willie Roger Bias caused the death of Robert Churchill, a human being," under Count One "with premeditation and with intent to effect the death of that person, or another," and under Count Two "with intent to effect the death of that person, or another, while committing or attempting to commit the felony of Aggravated Robbery." He claims the indictment fails because it merely repeats the statutory language without telling him exactly how the state claimed he committed the alleged crimes.

The indictment touches the essential elements of both crimes charged. *See* Minn. Stat. § 609.185(1), (3) (1986). Its language offers little beyond the words of the statute, but no greater particularity is needed if all that is essential to constitute the offense is stated fully and directly. *Oman*, 121 N.W.2d at 620. Even if the indictment lacks detail, appellant demonstrates no prejudice to his defense. The charge presents none of the problems posed by an indictment we recently found defective because it simply alleged the defendant exceeded his statutory authority. *State v. Serstock*, 402 N.W.2d 514, 518–19 (Minn.1987). In that case, neither the indictment nor any pretrial records told defendant what authority he had exceeded; he had no way to prepare a defense. *Id.* Bias, though, knew the essential facts of his charge: the death of a named person on a specific date, caused by him, with intent and with premeditation or while committing or attempting aggravated robbery. Other facts beyond the material elements

of the offense were available through discovery procedures. *Serstock*, 402 N.W.2d at 519; *State v. Becker*, 351 N.W.2d 923, 927 (Minn.1984). Moreover, Bias earlier had been served a second-degree murder complaint providing detailed notice of the facts underlying the state's case. We can only conclude that appellant knew precisely what was the charge against him. *See Clark*, 134 N.W.2d at 865.

We also find no merit in appellant's claim that the indictment exposes him to multiple prosecutions for the same offense. He points to *State v. LaValla*, 278 Minn. 63, 153 N.W.2d 135 (1967), where an indictment threatened double jeopardy when it failed to specify which of several kinds of burglary had been committed, even leaving questions about whether the charge alleged a felony or a gross misdemeanor. Bias' indictment allows no such confusion; it clearly identifies two specific types of murder recognized by statute and enough facts to bring the alleged offense within the statute. The indictment reflects the charge against Bias with sufficient accuracy to bar his subsequent prosecution for the same crime.

### III.

The trial court admitted for impeachment purposes evidence of appellant's 1981 conviction for criminal sexual conduct in the first degree. Bias testified despite that ruling and his counsel drew out the prior conviction on direct examination. On appeal, he claims the evidence was unduly prejudicial and warrants a new trial.

■ Evidence of a prior conviction within the last ten years is admissible to impeach a witness' credibility if the crime involved dishonesty or false statement, or if the crime was punishable by death or imprisonment exceeding one year and the court finds the probative value of the evidence outweighs its prejudicial effect. Minn.R.Evid. 609. For crimes in the latter category, weighing probative value and potential prejudice is left to the trial court's discretion. *State v. Graham*, 371 N.W.2d 204, 208 (Minn.1985). The court's decision will not be overturned absent a clear abuse of discretion. *Id.* at 209; *State v. Brouillette*, 286 N.W.2d 702, 707 (Minn.1979).

■ Bias' prior felony did not involve dishonesty or false statement, so the only question is whether the trial court abused its discretion in admitting evidence of the conviction to impeach Bias. Five factors should guide the trial court's decision: (a) the impeachment value of the prior conviction; (b) the date of the conviction and defendant's subsequent history; (c) the similarity of the prior conviction with the charged crime; (d) the importance of the defendant's testimony; and (e) the centrality of the credibility issue. *State v. Bettin*, 295 N.W.2d 542, 546 (Minn.1980); *State v. Jones*, 271 N.W.2d 534, 538 (Minn.1978).

■ While sexual crimes have less bearing on veracity than do many other crimes, *Bettin*, 295 N.W.2d at 546, impeachment is not improper simply because the prior crime is not directly related to truth or falsity. *State v. Lloyd*, 345 N.W.2d 240, 247 (Minn.1984); *Brouillette*, 286 N.W.2d at 707. Such evidence allows the jury to view the "whole person" and thus judge better the truth of his or her testimony. *Id.* Bias was released from prison on the 1981 offense just two years before the offense here, so the prior conviction's relevance has not substantially diminished. *See Bettin*, 295 N.W.2d at 546. Nor is criminal sexual conduct so similar to premeditated or felony murder that the jury inevitably made an improper inference about his propensity to commit the latter crimes. Even closer similarity between the prior and charged crimes does not preclude impeachment, though that factor weighs against admissibility. *See Bettin*, 295 N.W.2d at 546; *Brouillette*, 286 N.W.2d at 707–08.

■ Appellant seems to concede his credibility is at issue, but charges undue prejudice from the prior crime because his word stands against nothing but circumstantial evidence. That argument implies circumstantial evidence is somehow not enough and appellant's testimony deserves greater deference as a matter of law, a notion we reject. Further, key facts in this

case depended on whether the jury believed witness Bonnie Bender or Willie Bias, and particularly whether the jury believed Bias' portrayal of his actions at the end of and after the party. Bias' credibility, then, was central to the case, which weighs in favor of admitting impeachment evidence. We find no clear abuse of discretion in the trial court's ruling the probative value of the prior conviction outweighs its prejudicial effect.

Appellant's conviction is affirmed.