STATE of Minnesota, Respondent,

v.

David Arthur SPAETH, Appellant.

No. C9–95–1376.

Supreme Court of Minnesota.

July 11, 1996.

John M. Stuart, Public Defender, Leslie J. Rosenberg, Asst. Public Defender, Minneapolis, MN, for Appellant.

Hubert H. Humphrey, Atty. Gen., St. Paul, Michael O. Freeman, Hennepin County Atty., Michael Richardson, Asst. County Atty., Jean Burdorf, Staff Atty., Minneapolis, for Respondent.

Heard, considered, and decided by the court en banc.

## OPINION

PAGE, Justice.

Appellant David Arthur Spaeth was arrested on July 7, 1994, in connection with the July 6, 1994, murder of Linda Larsen at her home in Bloomington, Minnesota. Spaeth was subsequently indicted for Larsen's mur-

der and convicted of first-degree murder in violation of Minn.Stat. § 609.185(3) (1994), first-degree burglary in violation of Minn. Stat. § 609.582, subd. 1(a), and first-degree assault in violation of Minn.Stat. § 609.221 following a jury trial in Hennepin County. The trial court imposed consecutive sentences of life imprisonment for the murder conviction and, departing upward, 20 years for the burglary conviction.[1]

On appeal, Spaeth asks this court to reverse his convictions or, in the alternative, vacate his sentence because: (1) the evidence at trial was insufficient as a matter of law to prove beyond a reasonable doubt that he committed the offenses of murder in the first degree and burglary in the first degree; (2) he was denied due process of law when the state, to prove *Spreigl*[2] offenses, was allowed to introduce inculpatory statements he made in 1984 which the state at the time promised would not be used against him; (3) the prejudicial effect of the evidence related to the *Spreigl* offenses greatly outweighed its probative value; (4) the trial court improperly sentenced him to a consecutive statutory-maximum sentence of 20 years for the burglary conviction; and (5) the trial court erred in admitting into evidence unrecorded statements he made to police during execution of the search warrant at his home. We affirm as modified.

The state's evidence at trial established that during the early morning hours of July 6, 1994, Linda Larsen was murdered in the breezeway of her home at 8825 Portland Avenue South in Bloomington, Minnesota. At the time of the murder, Larsen lived with her husband of 10 years, Brad Burgeson (Burgeson), their 9–year–old daughter Andrea, and Burgeson's 19–year–old son Chad. On the evening of July 5, 1994, Larsen and Burgeson ate dinner together, had several drinks, and sat in the breezeway between their kitchen and garage talking. Burgeson went to bed between 9:30 and 10:00 p.m. Larsen stayed up late, as she often did, watching television in the breezeway and talking on the phone. Chad Burgeson spent the evening with friends and, when he arrived home at approximately 1:00 a.m., Larsen was still up. The two talked for a few minutes before he went to bed at approximately 1:30 a.m. Awakened by a banging noise at about 4:30 a.m., Chad got out of bed, looked out his bedroom window into the breezeway, saw that the television was still on, and observed the shadow of someone walking back and forth. He assumed that it was Larsen's shadow and went back to sleep.

Burgeson woke up at 5:30 a.m. and, finding that Larsen was not in bed, went to look for her. He found her in the breezeway lying, partially clothed, on the floor. Her body was cold, had no pulse, and there was "a hole in her head and there was blood running down her face." A large patio brick, broken into two pieces, was found on the floor near Larsen's head. There was a pool of blood in the center of the breezeway couch, and bloody drag marks led from the couch to the floor. Larsen's t-shirt and bra were pushed up, exposing her breasts, and her shorts and underpants, which had been removed, were found at the end of the couch. The positioning of Larsen's clothing suggested that she had been sexually assaulted.

In their initial search of the house and the surrounding area, the police found that a screen on one of the front windows had been cut, torn, and pushed in, and that a bush next to the window was smashed down, as if it had recently been stepped on. Bits of grass and yard debris were found inside under the window. The police concluded that this window was the perpetrator's point of entry into the house. On the south side of the house, police found a trail of matted down grass, about 40 to 50 feet long, moving in a west to east direction. Between the hours of 1:00 and 4:00 a.m., it rained a total of 1.3 inches in the east Bloomington area, and the grass appeared to have been matted down after the rain ended. The police also found three shoeprints that appeared to have been made after the rainfall. One shoeprint was found immediately outside the breezeway, another

---

1. Pursuant to Minn.Stat. § 609.04 (1994), Spaeth was not sentenced for the assault conviction.

2. The evidence of prior bad acts or previously committed crimes is commonly known as *Spreigl* evidence. *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965).

was under a maple tree in the backyard, and a third was near the swimming pool.

The morning of the murder, police canvassed the neighborhood around Larsen's home to determine if anyone had seen or heard anything. Two neighbors reported seeing a black two-door sport utility vehicle (SUV) parked on Oakland Avenue South, one block east of Larsen's house, between 4:45 and 5:00 a.m. The SUV's driver side window was seen open, and no one was visible inside.

That afternoon, upon hearing of the murder, Bloomington Police Officer Victor Poyer reported to the officers investigating Larsen's death that he had seen a black SUV at approximately 2:30 a.m. in the area of 86th Street and Oakland Avenue. Just before 3:00 a.m., he observed what appeared to be the same SUV driving down 90th Street between Chicago and Portland Avenues. The SUV was traveling slowly, braking in front of every few houses. At 3:02 a.m., Officer Poyer ran the SUV's license plate number on his computer because he was concerned that it might have been stolen or that "they were up to some criminal activity in [the] neighborhood." The vehicle registration came back indicating that the SUV was registered to Spaeth. Just as Officer Poyer was about to pull the SUV over, he was called away to a robbery alarm.

The Bloomington Police obtained a search warrant for Spaeth's home and executed it at approximately 1:30 a.m. on July 7. Spaeth was present, along with his fiancée Kelly Cavanaugh, his sister Cathy Spaeth, and two children. Spaeth, Cavanaugh, and Cathy Spaeth were each questioned. Cavanaugh told police that Spaeth had been home with her the night of Larsen's murder. Spaeth, however, told police that on the night of the murder he had been with his friend, John Wuchko, and had gone to a couple of bars and returned to Spaeth's home at approximately 1:30 a.m. He said that he and Wuchko spent the remainder of the night at Spaeth's. Spaeth denied being in east Bloomington the night of the murder. When asked where his shoes were, he directed police to a pair of shoes belonging to his sister, which both he and his sister used for

mowing the lawn. Police later recovered a pair of white Nike high-top shoes belonging to Spaeth from inside a red and white cooler on a shelf in Spaeth's garage.

Police arrested Spaeth at about 4:00 a.m. on July 7. At the time of his arrest, Spaeth had a fresh abrasion on the right side of his chest and a small scratch on his ankle. The day after Spaeth was arrested, Cathy Spaeth contacted the police and asked them to retrieve two bicycles from their garage. One had been in the cargo area of the SUV when Spaeth came home the morning of July 6, and Wuchko brought the other one over later that day. The bikes had been stolen from a residence four to five blocks from the murder scene. On the night of the murder, Officer Poyer saw Spaeth's SUV stop in front of the house where the bikes were stolen. When police searched Spaeth's SUV, they also found identification and credit cards belonging to Robert Johnson, who lived eight blocks from the murder scene. Johnson's wallet had been stolen the night of the murder.[3] No blood was found on Spaeth's shoes, and tests for blood from Spaeth's SUV proved inconclusive.

Trial testimony established that Spaeth and Wuchko were at a friend's house in west Bloomington between 9:00 and 10:45 p.m. on July 5. At that time, Spaeth was wearing white high-top shoes and Wuchko was wearing hiking boots. After leaving the friend's house, Spaeth and Wuchko went to a couple of bars and, then, at about 1:30 a.m., went to the Burnsville apartment of Tammy Glum, a friend of Wuchko's. At Glum's, Wuchko went in, had a conversation with Glum, and grabbed some beer, while Spaeth waited outside. Glum's mother testified that Wuchko returned to the apartment between 3:00 and 4:00 that morning. Glum testified that, riding a bicycle, Wuchko returned to her apartment between 3:00 and 3:30 a.m., wet and muddy from the rain. Glum also testified that when Wuchko returned, he was wearing the same brown shoes he had been wearing earlier in the evening. The distance between east Bloomington and Glum's apartment is almost eight miles and by bicycle would have

---

**3.** It is unclear whether Johnson's wallet was stolen from his house or his car.

taken at least 43 minutes to travel. Both Glum and her mother testified that when Wuchko returned to the apartment, he fell asleep on the floor and stayed there until morning. Kelly Cavanaugh testified that Spaeth arrived home on the morning of July 6 at about 5:30 a.m. and lied to her about where he had been, telling her that he and Wuchko had been at a couple of bars and then gone to Lakeville to repossess a car.

Joseph Carpenter, an inmate who was housed in a segregation unit with Spaeth after Spaeth's arrest, testified that Spaeth told him that he had strangled and beaten Larsen to death. Ross Swanson, the police officer who interviewed Carpenter, testified that Carpenter knew detailed facts about the murder which were not available to the public. Carpenter and his parole officer both testified that Carpenter did not get a "deal" for testifying against Spaeth, although Officer Swanson indicated that Carpenter told him that he hoped that the information he provided would get him into alcohol treatment instead of prison.

Dr. Michael Heninger, a forensic pathologist in the Hennepin County Medical Examiner's Office, conducted an autopsy on Larsen's body and, at trial, testified that Larsen's hyoid bone was broken, indicating that she had been manually strangled. Dr. Heninger also found abrasions on Larsen's neck, breasts, thigh, elbows, and hand. In addition, he estimated that Larsen had been struck in the head between 6 and 30 times and that, as a result, Larsen suffered a number of fractures to her skull. The fractures were consistent with the broken patio brick found at the murder scene. One of Larsen's head wounds was a laceration on the right side of her forehead that measured 3 inches by 1 1/2 inches. The force of the blow causing that laceration forced pieces of Larsen's skull into her brain. Dr. Heninger concluded that that injury alone was sufficient to cause Larsen's death. Dr. Heninger estimated the time of Larsen's death to have been between 2:30 and 5:30 a.m. on July 6.

A sexual assault examination performed on Larsen's body revealed small amounts of sperm and enzyme in Larsen's vagina. Based on that biological sample, Dr. Heninger concluded that either: (1) Larsen had had intercourse one to two days before her death; (2) the man who was the source of the biological sample had withdrawn before ejaculation; or (3) the man who was the source of the biological sample was not functioning properly. DNA testing performed on the biological sample produced what is called a mixed sample, meaning that Larsen's DNA could not be extracted from the sample and therefore an exact genotype match could not be made. The DNA testing indicated, however, that Spaeth's DNA was consistent with the sample taken from Larsen. As a result, Spaeth could not be eliminated as the source of the sample. The DNA test results did eliminate Brad Burgeson, Chad Burgeson, and John Wuchko as possible sources.

Don Melander, a shoeprint comparison expert employed by the Minnesota Bureau of Criminal Apprehension, testified that the tread pattern on Spaeth's white Nike high-top shoes was consistent with the shoeprints found immediately outside the breezeway and under the maple tree in the victim's backyard. According to Melander, the size, shape, and "the general wear" of Spaeth's Nike high-top shoes appeared "quite similar" to those shoeprints. Spaeth's shoes did not match the shoeprint found near the swimming pool. Examination of shoes belonging to Larsen's family members, Wuchko, and Chad Burgeson's friends revealed that none matched any of the shoeprints found at the scene.

At trial, the state also introduced, as *Spreigl* evidence, testimony relating to two July 1984 Apple Valley residential burglaries that Spaeth had previously admitted committing. In one burglary, Spaeth hit a 12-year-old girl on the head with a rock and, in the other, Spaeth hit an 11-year-old girl on the head with a decorative cement block.

Spaeth testified in his own defense and admitted that he initially lied to police when questioned about being in east Bloomington the night of Larsen's murder. He also acknowledged that his SUV was parked at 88th Street and Oakland Avenue, one block east of Larsen's home, around the time of the murder. He testified that he was wearing his

sister's lawn mowing shoes the night of the murder and had brought his Nike high-top shoes for Wuchko to wear. He further testified that he believed Wuchko changed into the Nike shoes at Tammy Glum's apartment. According to Spaeth, after leaving Glum's apartment, the two drove around drinking beer and smoking marijuana when at some point Wuchko directed Spaeth to park the SUV on Oakland Avenue. Spaeth testified that he did not know exactly where he was, but he remembered passing a branch of the Hennepin County Library. Wuchko left the SUV and asked Spaeth to wait for him. Spaeth testified that he was waiting in his SUV from about 3:10 to 5:00 a.m., while Wuchko left the SUV, came back, and then left again. The first time Wuchko left, he was gone for approximately 45 minutes and returned riding a bicycle, which Spaeth helped load into the back of the SUV. When Wuchko left the second time, Spaeth waited in the SUV, sitting on the driver's side with the seat eased back. Spaeth remembered seeing somebody walking a dog while he was waiting, but did not see anybody else in the neighborhood. According to Spaeth, about 30 minutes after Wuchko left the second time, Spaeth got out of the SUV to look for Wuchko, could not find him, returned to the SUV, and headed home. Spaeth testified that before he drove home, he pulled into a convenience store at 79th Street and Nicollet Avenue in Bloomington and asked an employee for directions to the Hennepin County Library so that he could go back and look for Wuchko again. An employee of the convenience store confirmed that a man pulled into the parking lot at about 5:00 a.m., asking for directions to the public library. Spaeth arrived home at 5:30 a.m.

During his testimony, Spaeth informed the jury that he pled guilty to receiving stolen property in November of 1984 and to second-degree burglary in 1987. In addition, he admitted committing three other residential burglaries in Apple Valley and Lakeville in the summer of 1984, but denied any involvement in the July 1984 burglaries. Spaeth told the jury that he admitted to the July 1984 burglaries because he believed that he was required to do so by the conditions of his November 1984 plea agreement.

Spaeth first asserts that the evidence admitted at trial was insufficient to support his convictions for first-degree murder and first-degree burglary because the evidence against him was weak and circumstantial. In resolving sufficiency of the evidence claims, we review the record to determine whether the evidence, viewed in the light most favorable to the verdict, was sufficient to permit a reasonable jury to have found the defendant guilty. *State v. Moore,* 438 N.W.2d 101, 108 (Minn.1989). This court does not retry the facts, but instead views the evidence in the light most favorable to the jury's verdict and assumes that the jury believed the state's witnesses and disbelieved any evidence to the contrary. *State v. Pierson,* 530 N.W.2d 784, 787 (Minn.1995). A conviction based on circumstantial evidence, however, merits stricter scrutiny. *State v. Bias,* 419 N.W.2d 480, 484 (Minn.1988). While circumstantial evidence is entitled to the same weight as other evidence, there is an additional requirement that the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except guilt. *Id.*

We conclude that the circumstantial evidence of Spaeth's guilt, viewed in the light most favorable to the jury's verdict, was sufficient to permit a reasonable jury to have found him guilty. Spaeth testified that his SUV was parked a block away from Larsen's house between 3:00 and 5:00 a.m. on the night of the murder; there was testimony that two neighbors saw an empty vehicle similar to Spaeth's parked one block east of the victim's house on Oakland Avenue at approximately 5:00 a.m.; a trail of freshly matted down grass leading in the direction of Spaeth's SUV was found in the victim's backyard; there was evidence that Spaeth was wearing white high-top shoes on the night of the murder; two shoeprints in the victim's backyard were consistent with Spaeth's white Nike high-top shoes; Spaeth, when asked for his tennis shoes, tried to mislead the police by directing them to a pair of shoes he and his sister used for mowing the lawn; Spaeth's white Nike high-top shoes were later found hidden in a cooler in his garage;

Spaeth lied to the police and to his fiancée as to where he was and what he was doing the night of the murder; at the time of his arrest, Spaeth had a fresh abrasion on the right side of his chest and a small scratch on his ankle; Spaeth's SUV was seen prowling the neighborhood where the murder took place on the night of the murder by a Bloomington police officer; the biological sample taken from Larsen's body was consistent with Spaeth's DNA and inconsistent with that of the other potential suspects; and there was testimony from Joseph Carpenter that Spaeth admitted murdering Larsen.

■ Spaeth next claims that the trial court committed prejudicial error by admitting evidence of his involvement in the July 1984 burglaries. Over the defense's objection, the trial court allowed the state to introduce evidence of the two July 1984 burglaries that Spaeth previously admitted committing. Spaeth claims it was prejudicial error to admit this evidence because: (1) the state, to prove the two burglaries, introduced a statement made by Spaeth which he contends the state promised would not be used against him; (2) evidence of his participation in the two burglaries was not clear and convincing; and (3) the potential for unfair prejudice outweighed the probative value of the evidence.

■ To admit so-called *Spreigl* evidence, the trial court must find that: (1) there is clear and convincing evidence that the defendant participated in the other incidents; (2) the evidence is relevant and material to the state's case; and (3) the probative value of the evidence outweighs its potential for unfair prejudice. *State. v. Berry,* 484 N.W.2d 14, 17 (Minn.1992). Admission of *Spreigl* evidence lies within the sound discretion of the trial court, and a trial court's ruling will not be reversed absent a clear abuse of discretion. *State v. Steinbuch,* 514 N.W.2d 793, 800 (Minn.1994).

In August of 1984, Spaeth was arrested for two burglaries, one of an occupied dwelling in Lakeville, and one of an occupied dwelling in Apple Valley. He later admitted that he also had committed a burglary that took place on June 27, 1984, in Apple Valley. In October, Spaeth was arrested again on a charge of receiving stolen property. Spaeth was represented by a public defender who negotiated a plea agreement for the August 1984 burglaries and the charge of receiving stolen property.[4] At the time the plea agreement was being negotiated, police suspected that Spaeth had also been involved in other burglaries in Apple Valley and sought to discuss two unsolved July 1984 burglaries with him. Spaeth's public defender negotiated a separate agreement whereby Spaeth would talk to the police about the two July burglaries and, in return, would not be charged with those burglaries. There is no written agreement in the record concerning the terms of this separate agreement. However, Spaeth's 1984 public defender testified during Spaeth's trial for Larsen's murder that he discussed the matter with the county attorney in 1984 with the goal of "obtain[ing] assurance from the county attorney's office that if he—Mr. Spaeth chose to talk about [the July 1984] suspected incidents and if they were cleared then by his discussion with Officer Spandl, that there would not be any formal charges for those incidents."[5]

In November 1984, after Spaeth had pled guilty to the August 1984 burglaries and receiving stolen property, he gave the police a statement in which he admitted committing the two July 1984 burglaries and assaulting the two victims. A supplemental report filed by the police officer who took the statement indicates that, as part of an agreement with the public defender, a statement could be taken from Spaeth "under the condition that it was off the record" and that Spaeth's name "is not to be released to the press or his parents notified." Prior to questioning

---

**4.** As part of the agreement, the charge for the June 1984 burglary was dismissed.

**5.** Spaeth's 1984 public defender no longer had the file pertaining to his representation of Spaeth, and his testimony was based on his memory and review of the court files. He de-

nied, however, that his testimony was based on "guesswork." He recalled that while discussion of the July 1984 burglaries was part of the plea negotiations, Spaeth was not required to speak to the police to benefit from the plea bargain, nor was it a term or condition of his probation.

Spaeth about the two July 1984 burglaries, the interviewing officer told Spaeth, "This statement is given with the understanding that it would not be used against David Spaeth." [6] No *Miranda* warnings were given.

Spaeth now denies any involvement in the July 1984 burglaries. He claims that he admitted to the two burglaries to get the benefit of the plea agreement and then only on condition that: the statement would never be used against him; the information he gave would never be released to the media; and his parents would not be told about his involvement in the burglaries. Spaeth maintains, therefore, that the statement was rendered involuntary when it was used against him to establish his guilt in Larsen's murder.

The state, however, contends that the agreement regarding Spaeth's statement was only an agreement not to prosecute him for anything related to the two July 1984 burglaries—not an agreement that the statement would never be used against him under any circumstances. In support of its position, the state notes that Spaeth's 1984 public defender testified at the Rasmussen hearing on Larsen's murder that the terms of the agreement were that if Spaeth admitted his involvement with the July 1984 burglaries, he would not be charged for those offenses. He also testified that he conveyed the terms to Spaeth and did not recall any other promises being made with regard to Spaeth's 1984 statement. Finally, the state notes that the officer who interviewed Spaeth about the July 1984 burglaries was not involved in negotiating the terms of the agreement.

▮ Statements are subject to suppression as violative of due process if the statements are coerced or involuntary. *See Jackson v. Denno,* 378 U.S. 368, 385–86, 84 S.Ct. 1774, 1785–86, 12 L.Ed.2d 908 (1964). "Coercive conduct may consist of promises, express or implied, that elicit a confession." *State v. Hince,* 540 N.W.2d 820, 824 (Minn. 1995). A promise that statements made will not be used against the declarant may render the statements involuntary. *United States v.*

*Conley,* 859 F.Supp. 830, 836 (W.D.Pa.1994). The mere existence of a promise in the process of obtaining a confession, however, will not automatically render the confession involuntary. *State v. Thaggard,* 527 N.W.2d 804, 811 (Minn.1995). Instead, the court must look at the totality of the circumstances, including the age, maturity, intelligence, education, and experience of the defendant; the defendant's ability to comprehend; the adequacy or lack of a warning; length and legality of the detention; nature of the interrogation; and whether the defendant was denied access to friends and family, or deprived of physical needs. *Id.* at 808.

The Supreme Court has analogized plea agreements to contracts, holding that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971); *accord State v. Williams,* 418 N.W.2d 163, 168 (Minn.1988) (stating that a "plea agreement is in many ways analogous to a contract"). Principles of contract law are also relevant to the interpretation of the promises underlying Spaeth's 1984 statement here. *See Commonwealth v. Ginn,* 402 Pa.Super. 405, 587 A.2d 314, 316 (1991) (finding a non-prosecution agreement is analogous to a plea bargain agreement); *People v. Fisher,* 657 P.2d 922, 927 (Colo.1983) (concluding that the government may be bound by a promise that does not arise in the context of a formal plea bargain). Because of the constitutional implications involved in criminal proceedings, courts frequently temper contract principles with "safeguards to insure the defendant [receives] what is reasonably due in the circumstances." *Santobello,* 404 U.S. at 262, 92 S.Ct. at 499.

We have considered each of Spaeth's arguments related to this issue and conclude that the 1984 agreement, resulting in Spaeth's statement to the police about the July 1984 burglaries, was a non-prosecution agreement which was fulfilled in 1984 when Spaeth ad-

6. The officer testified that by this statement he meant that "anything that resulted from the statement would not be used in regards to the two burglaries that we believed [Spaeth] was involved in."

mitted his involvement in the July 1984 burglaries and, in return, the state did not prosecute him for those offenses. Therefore, the trial court did not abuse its discretion in admitting the statement. Further, the interviewing police officer's assurance to Spaeth that his statement would not be used against him, even if given a broad interpretation, does not affect our determination because it appears unlikely that anything the officer said actually induced Spaeth to confess to the burglaries. *See United States v. Walton,* 10 F.3d 1024, 1029 (3d Cir.1993) (concluding that "the real issue is not whether a promise was made, but whether there was a causal connection" between the promise and the statement). Spaeth was represented by counsel, who negotiated the terms under which Spaeth would talk to the police about the July 1984 burglaries. The terms were that if Spaeth made a statement to the police, he would not be prosecuted for those crimes. Spaeth agreed to those terms prior to talking with the police. The police officer who took Spaeth's statement did not participate in negotiating the terms of the agreement. The use of the statement as evidence in Spaeth's murder trial was an unanticipated collateral consequence that does not render the confession involuntary.

Spaeth argues in the alternative that the state did not prove his participation in the *Spreigl* offenses by clear and convincing evidence. First, Spaeth claims that he was pressured by police into giving a false confession. Spaeth's 1984 public defender testified, however, that Spaeth was not required to speak to the police about the July 1984 burglaries to benefit from the plea agreement reached resolving the other 1984 offenses. Moreover, Spaeth had already pled guilty to and been sentenced for the other charges at the time he made the statement. Spaeth also contends that the circumstances of the two alleged *Spreigl* offenses raise doubts about whether any burglaries ever took place, in that the injuries to one of the victims were the result of child abuse, and the incident involving the other victim was a fantasy concocted by the victim. Given Spaeth's 1984 statement with respect to his involvement in both July 1984 burglaries, the testimony presented at the murder trial from the victims of the July 1984 burglaries, and the testimony from the police officer who conducted the 1984 interview in which Spaeth made his statement regarding the burglaries, we find Spaeth's argument that the state failed to prove the *Spreigl* offenses by clear and convincing evidence unpersuasive.

Finally, with respect to the July 1984 *Spreigl* incidents, Spaeth contends that the potential for unfair prejudice outweighs the probative value of the evidence admitted because the jury was likely to view him as having a tendency to commit burglary and that the extensive *Spreigl* testimony diverted the jury's attention away from Larsen's murder for which he was being tried to the *Spreigl* offenses. To be admissible, the evidence of Spaeth's participation in the July 1984 burglaries must be relevant and material to the state's case, and the probative value of the evidence must outweigh the potential for unfair prejudice. *Ture v. State,* 353 N.W.2d 518, 521 (Minn.1984). Although evidence of other crimes is inadmissible to show that the accused acted in conformity with his proven character, such evidence may be admitted for legitimate purposes, such as proof of motive, intent, absence of mistake, identity, or common purpose or plan. Minn. R. Evid. 404(b); *State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965). Here, the trial court allowed the evidence of the two July 1984 burglaries for the legitimate purposes of showing identity and modus operandi. In all three cases, the two *Spreigl* offenses and Larsen's murder, Spaeth looked for a house with lights on, then burglarized an occupied residence at night, and, once inside, struck someone he encountered on the head with a brick or a rock that he found in or near the residence.

Further, the probative value of the evidence outweighed its potential for unfair prejudice. The evidence bolstered the state's case on the issue of identity and helped rebut Spaeth's innocent explanation for his presence near the crime scene. All evidence offered against defendants in criminal trials is prejudicial to some extent— whether *Spreigl* or otherwise. *See State v. Bolte,* 530 N.W.2d 191, 197 n. 3 (Minn.1995). The *Spreigl* evidence admitted here was not

so prejudicial as to be unfair. In addition, the trial court minimized the prejudicial effect of the *Spreigl* evidence by providing the jury with appropriate cautionary instructions at the time that the evidence was introduced and again at the close of the case. Accordingly, we conclude that in admitting the *Spreigl* evidence, the trial court properly exercised its discretion.

■ Next, Spaeth challenges the sentence imposed by the trial court for the first-degree burglary conviction. He received a mandatory term of life imprisonment for the first-degree murder conviction and a consecutive 20–year sentence for the burglary conviction.[7] He contends that the trial court improperly departed upward from the presumptive sentence for the burglary under the Minnesota Sentencing Guidelines.

The sentencing guidelines are designed to "establish rational and consistent sentencing standards which reduce sentencing disparity and ensure that sanctions following conviction of a felony are proportional to the severity of the offense of conviction and the extent of the offender's criminal history." Minnesota Sentencing Guidelines I. The trial court is required to impose the presumptive sentence for an offense "unless the individual case involves substantial and compelling circumstances." *Id.* II.D; *see also State v. Garcia*, 302 N.W.2d 643, 647 (Minn.1981) (discussing departure from the guidelines).

The trial court here adopted the following reasons for departing upward:

First of all, that the burglary committed here is more serious than the typical burglary in the first degree. I think that's obvious by virtue of the death of the victim.

Second of all, that the victim was particularly vulnerable at the time of her death, in that she was in her home in the middle of the night; that she either had been or was immediately prior to her death sleeping on a couch.

Third, that this act involved gratuitous violence in the form of repeated blows to the head of Linda Larsen.

Finally, that there was mutilation to the body in the form of puncture marks, some of which were indicated to have been inflicted after death.

Spaeth claims that it was improper to use these reasons to depart upward because they are factors which supported the murder conviction. We agree. Spaeth received a life sentence for the murder conviction, and it is impermissible to use as aggravating and vulnerability factors conduct that resulted in Larsen's murder to justify an upward departure for the burglary conviction. That is exactly what the trial court did here. Further, our review of the record does not disclose any other factors justifying the upward departure for the burglary conviction sentence. *See Williams v. State*, 361 N.W.2d 840, 844 (Minn.1985). Accordingly, we modify Spaeth's sentence for the first-degree burglary conviction to 21 months, the presumptive guidelines sentence.[8]

Finally, Spaeth, in his pro se brief, argues that the trial court erred in admitting into evidence statements he made to police during the execution of the search warrant at his home. This argument fails for two simple reasons: First, our review indicates that, on the facts before us, the argument has no merit, and second, this issue was known to Spaeth at the time of his trial, but was not raised in the trial court and is therefore

---

7. Spaeth was convicted of first-degree burglary under Minn.Stat. § 609.582, subd. 1(a) (1994), which provides:

> Whoever enters a building without consent and with intent to commit a crime, or enters a building without consent and commits a crime while in the building, commits burglary in the first degree * * * if:
>> (a) the building is a dwelling and another person not an accomplice is present in it * * *.

Under Minn.Stat. § 609.585 (1994), a conviction of the crime of burglary is "not a bar to conviction of or punishment for any other crime committed on entering or while in the building entered."

8. At sentencing, the trial court proceeded under the assumption that the guidelines sentence for the burglary conviction was 86 months based on a criminal history score of 0 and a severity level of VIII. The severity level for first-degree burglary under Minn.Stat. § 609.582, subd. 1(a), however, is only level VI, and the presumptive sentence should be 21 months with a criminal history score of 0.

deemed waived. *See State v. Kremer*, 307 Minn. 309, 312–13, 239 N.W.2d 476, 478 (1976) (expressing "fundamental rule" that this court will not decide issues raised for the first time on appeal even where defendant alleges unconstitutional criminal procedures).

Affirmed as modified.